J-S33028-20

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| MICHAEL WAY | : | |
| | : | |
| Appellant | : | No. 3061 EDA 2019 |

Appeal from the Judgment of Sentence Entered August 14, 2019
In the Court of Common Pleas of Philadelphia County Criminal Division at
No(s): CP-51-CR-0006057-2017

BEFORE:   DUBOW, J., MURRAY, J., and STEVENS, P.J.E.[*]

MEMORANDUM BY MURRAY, J.:                          Filed: August 25, 2020

Michael Way (Appellant) appeals from the judgment of sentence imposed following his convictions of possession of a controlled substance and possession with the intent to deliver a controlled substance (PWID).[1] Appellant challenges the trial court's denial of his suppression motion. After careful consideration, we affirm.

The trial court summarized the testimony from the suppression hearing:

> While conducting a separate investigation, Office[r] [Timothy] Bogan [(Officer Bogan)] observed a blue pickup truck in the Franklin Mills parking lot of Dick[']s Sporting Goods, at approximately 1:45 p.m. on April 26, 2017.  He observed a white Cadillac arrive and pull up in front of the blue pickup truck and honk its horn.  The Cadillac drove off slowly and the blue pickup truck followed the Cadillac[,] lawfully parking in the Wal-Mart parking lot.  Officer Bogan became suspicious of the two vehicles

---

[*] Former Justice specially assigned to the Superior Court.

[1]  35 P.S. §§ 780-113(a)(16), (30).

at this time and watched the driver of the blue pickup truck get out of the vehicle and enter the front passenger side of the Cadillac. After waiting for approximately one minute, Officer Bogan and Officer [Brian] Sumpter [(Officer Sumpter)], dressed in plain clothing, stepped out of their unmarked [vehicle], approached the Cadillac, and announced themselves as police officers. Four other officers joined Officer Bogan and Officer Sumpter, bringing the number of officers involved in the questioning to six. Upon approaching the Cadillac, Officer Sumpter observed through tinted windows and an open door, a plastic bag containing crack cocaine packets between [Appellant]'s legs. Upon observing the narcotics, Officer Sumpter[] further opened the already opened driver door where he detained [Appellant], recovering a total of 59 smaller packets of crack cocaine with the large Ziploc bag.

Officer Bogan has around 30 years of experience as a police officer and over 20 years of narcotics experience[,] with personal experience dealing with drug transactions. [Officer Bogan testified:]

A: Your Honor, as to my years of me also purchasing narcotics, I would be waiting -- after I would make a phone call, I would be waiting in the vehicle or on the corner, and a ca[r] would pull up and blow his horn for me to get into the vehicle to make a purchase.

Q: So you have witnessed or in the past, you had witnessed narcotics transactions with all of the similar patterns?

A: I had witnessed them and also performed them myself.

[N.T., 4/17/19, at 11]. Officer Sumpter has around 24 years of experience in narcotics as well.

Trial Court Opinion, 1/22/20, at 1-2.

Following his arrest, the Commonwealth charged Appellant with possession of a controlled substance and PWID. On July 10, 2018, Appellant filed a motion to suppress the drugs recovered from his encounter with the police. On April 17, 2019, the trial court held a hearing on Appellant's

suppression motion. At the conclusion of the hearing, the trial court denied the motion, and the case immediately proceeded to a bench trial. The trial court found Appellant guilty of the aforementioned crimes. On August 14, 2019, the trial court sentenced Appellant to three years of probation.

On October 10, 2018, following the grant of *nunc pro tunc* relief, Appellant filed a notice of appeal to this Court. Both the trial court and Appellant have complied with Pennsylvania Rule of Appellate Procedure 1925.

On appeal, Appellant presents the following issue for review:

1. Police initiated an investigative detention after observing two people meet in a mall parking lot after arriving in separate cars. Did the Commonwealth fail to establish reasonable suspicion to justify the detention?

Appellant's Brief at 3.

At the outset, we recognize:

[An appellate court's] standard of review in addressing a challenge to the denial of a suppression motion is limited to determining whether the suppression court's factual findings are supported by the record and whether the legal conclusions drawn from those facts are correct. Because the Commonwealth prevailed before the suppression court, we may consider only the evidence of the Commonwealth and so much of the evidence for the defense as remains uncontradicted when read in the context of the record as a whole. Where the suppression court's factual findings are supported by the record, [the appellate court] is bound by [those] findings and may reverse only if the court's legal conclusions are erroneous. Where . . . the appeal of the determination of the suppression court turns on allegations of legal error, the suppression court's legal conclusions are not binding on an appellate court, whose duty it is to determine if the suppression court properly applied the law to the facts. Thus, the conclusions of law of the courts below are subject to [ ] plenary review.

*Commonwealth v. Jones*, 121 A.3d 524, 526-27 (Pa. Super. 2015) (citation omitted). Our scope of review is limited to the evidentiary record from the suppression hearing. *In re L.J.*, 79 A.3d 1073, 1087 (Pa. 2013).

Appellant argues that the police lacked reasonable suspicion to detain him in the Wal-Mart parking lot. Appellant contends the evidence at the suppression hearing merely established that "Appellant in the white Cadillac drove up to the blue pickup truck in the parking lot, honk[ed] his horn, and allow[ed] the individual in the blue pickup truck [to] enter the passenger side after both vehicles parked." Appellant's Brief at 8. Appellant asserts these facts did not "establish reasonable suspicion that drug activity was afoot." *Id.*

There are three categories of interactions between police and citizens:

> The first of these is a "mere encounter" (or request for information) which need not be supported by any level of suspicion, but carries no official compulsion to stop or to respond. The second, an "investigative detention" must be supported by a reasonable suspicion; it subjects a suspect to a stop and a period of detention, but does not involve such coercive conditions as to constitute the functional equivalent of an arrest. Finally, an arrest or "custodial detention" must be supported by probable cause.

*Commonwealth v. Downey*, 39 A.3d 401, 405 (Pa. Super. 2012) (citation omitted).

"To guide the crucial inquiry as to whether or not a seizure has been effected, the United States Supreme Court has devised an objective test entailing a determination of whether, in view of all surrounding circumstances, a reasonable person would have believed that he was free to leave." *Commonwealth v. Strickler*, 757 A.2d 884, 889 (Pa. 2000). In evaluating

the totality of the circumstances, our focus is whether, "by means of physical force or show of authority, the citizen-subject's movement has in some way been restrained." ***Id.*** at 889. In making this determination, no single factor dictates "the ultimate conclusion as to whether a seizure has occurred." ***Id.***

In this case, neither party disputes that the officers conducted an investigatory detention of Appellant. When evaluating the legality of investigative detentions, Pennsylvania has adopted the holding of ***Terry v. Ohio***, 392 U.S. 1 (1968), where the United States Supreme Court held that police may conduct an investigatory detention if they have reasonable suspicion that criminal activity is afoot. ***In re: D.M.***, 781 A.2d 1161, 1163 (Pa. 2001). These encounters with police are commonly known as ***Terry*** stops. In order to prove reasonable suspicion, "the police officer must be able to point to specific and articulable facts and reasonable inferences drawn from those facts in light of the officer's experience." ***Commonwealth v. Cook***, 735 A.2d 673, 677 (Pa. 1999). "The determination of whether an officer had reasonable suspicion that criminality was afoot so as to justify an investigatory detention is an objective one, which must be considered in light of the totality of the circumstances." ***Commonwealth v. Walls***, 53 A.3d 889, 893 (Pa. Super. 2012).

In this case, Officer Bogan testified as follows at the suppression hearing:

> On [April 26, 2017], myself, along with other members of my
> team, we set up surveillance of the Franklin Mills parking lot for

another investigation, Your Honor. At approximately 1:45 p.m.[,] I observed a blue pickup arrive in the Franklin Mills parking lot and park in a handicap parking spot by -- I believe it is Dick[']s Sporting Goods.

At that point, Your Honor, two minutes later, a white Cadillac arrived and pulled in front of the blue pickup truck. I heard a horn blown, and the Cadillac slowly drove off and the blue pickup followed the Cadillac. At that point, it kind of raised my suspicion, Your Honor.

At that point in time, I watched the vehicles and [they] pulled over to the Wal-Mart parking lot. At that point, the operator of the blue pickup was identified as Joe Russo. He exited the front pickup and entered the front passenger's side of the Cadillac.

At that point, Your Honor, I waited a minute or so. We approached the vehicle, identified ourselves as police officers. Officer Sumpter was on the driver's side of the vehicle and he relayed to me that [Appellant] had a plastic bag in between his legs that contained crack packets.

At that point, Russo was taken out of the vehicle, as well as [Appellant]; that plastic baggie contained 12 peach colored packets of crack cocaine and 47 clear packets of crack cocaine. Also confiscated off of [Appellant] was $467.00 US currency and then two cell phones.

Your Honor, while we are out there, Mr. Russo stated that he owed [Appellant] $50 United States currency and there was $50 recovered from the center console. At that point, there [was] nothing recovered from Mr. Russo and he was released at the scene. Back inside of headquarters, I conducted a NIK Test G, which I'm certified to do, and that test was positive for the presence of cocaine base. The narcotics, money and cell phones were placed on a property receipt.

N.T., 4/17/19, at 7-9.

Importantly, Officer Bogan further testified regarding his extensive experience with narcotics investigations:

Q.    And now, Officer Bogan, how long have you been a police officer?

A.    Going on 30 years.

Q.    And during the course of those 30 years, where have you been assigned?

A.    When I graduated the academy, Your Honor, I was assigned to the 23rd District in '89.  In '97, I transferred to the Narcotic Strike Force, which is a uniformed branch of the Narcotics Field Unit.

In May of 98, I was transferred to the Narcotics Field Unit. In July of 2011 -- I believe it is 2011 -- I was transferred to Internal Affairs.  In July of 2012, I was transferred back into the Field Unit, and that is where I have been since.

Q.    Officer -- I'm sure you don't have the exact number, but over the course of your career, can you give us a rough estimate of how many narcotics investigations you've participated in?

A.    I will say, well over 500.

Q.    And have you received any specialized training with respect to the packaging sale and the use of narcotics?

A.    We did receive a two-week training prior to coming to the Strike Force on the packaging of narcotics.  But when I was in the 23rd -- we made narcotics arrests in the 23rd.  So I kind of like was familiar with the way narcotics are packaged.

Q.    Now, you indicated that the vehicle -- I believe you said i[t] was a blue pickup truck?

A.    Yes.

Q.    And then the white Cadillac came in after the h[o]nk of the horn.

A.    Yes.

Q.    And you indicated that this raised your suspicion.  Can you tell the court why?

A.     Your Honor, as to my years of me also purchasing narcotics, I would be waiting -- after I would make a phone call, I would be waiting in the [] vehicle or on the corner, and a ca[r] would pull up and blow his horn for me to get into the vehicle to make a purchase.

Q.     So you have witnessed or in the past, you had witnessed narcotics transactions with all of the similar patterns?

A.     I had witnessed them and also performed them myself.

Q.     Now when you approached the Cadillac, was that vehicle parked?

A.     Yes.  Both vehicles were parked.  When the Cadillac pulled up in front of the blue pickup at Dick[']s Sports, before we drove off, the pickup followed the Cadillac to [the] Wal-Mart parking lot and they parked side by side or close to side by side.  Russo exited and entered [Appellant]'s vehicle.

Q.     And now were you and your fellow officers on foot or on the vehicle yourselves?

A.     We were in the vehicles.

Q.     And you said you pulled up to that location when you got out of your vehicle?

A.     Your Honor, I approached the passenger's side of the vehicle with other officers and Officer Sumpter approached the driver's side of the vehicle with other officers.

Q.     And how far away from the occupants of the vehicle were you when you approached it?

A.     I mean I was walking up on the vehicle.  So at that point, I'm walking up and I'm exiting my vehicle and walk up to the Cadillac.

Q.     So were you able to see clearly inside of the vehicle?

A.     I can see inside of the vehicle, yes.

Q.    Were you able to see what Officer Sumpter and Brown were doing at the same time?

A.    I could not see what Officer Sumpter was doing. My focus on that point was on Russo, and I did see money in the center console.

Q.    And what was it that you believed that you were observing as you walked up to that vehicle?

A.    Based on my experience, I believed that to be a drug delivery service.

*Id.* at 9-12.

Thus, the record reflects that during the afternoon on the date in question, Officer Bogan and five other Narcotics Field Unit officers were conducting surveillance of a mall parking lot for drug trafficking. *Id.* at 7. Officer Bogan observed a white Cadillac drive into a Dick's Sporting Goods parking lot and stop in front of a parked blue pickup truck. *Id.* at 7-8. The driver of the Cadillac honked his horn at the truck. *Id.* at 8. Officer Bogan then saw the truck follow the Cadillac to the Wal-Mart parking lot, where the vehicles parked next to each other. *Id.* Officer Bogan observed the driver of the truck exit his vehicle and enter the Cadillac, sitting in the front passenger seat. *Id.* Based on his extensive narcotics investigation experience, including 30 years on the Philadelphia Police Force, 21 of which he spent on the Narcotics Field Unit, Officer Bogan recognized the behavior of the respective drivers of the vehicles as a narcotics transaction. *Id.* at 9-11. Officer Bogan testified that he made this determination based on his participation in "well over" 500 narcotics investigations, many of which he acted as a drug buyer,

and executed the same pattern of behavior. *Id.* at 10-11. Officer Bogan explained that in those cases, the narcotics seller would often drive up to the vehicle of the buyer, honk the car horn, and then lead the buyer to another location to park and conduct the drug transaction. *Id.* at 11.

The record reveals that the six officers surveilling the area then converged on the Cadillac. *Id.* at 8, 12, 14, 18. When Officer Sumpter approached the Cadillac, he opened the driver's side door and saw Appellant sitting with several packets of crack cocaine in a clear Ziploc Bag between his legs. *Id.* at 18.

In support of his argument, Appellant relies on *Commonwealth v. Walton*, 63 A.3d 253, 255 (Pa. Super. 2013). In *Walton*, the trial court relied on the following facts in making the determination that the police had reasonable suspicion to stop and detain the appellant:

> Officer Bridges testified that he saw a white male and female in the parking lot kind of walking around, pacing back and forth, and that [t]hey were on and off their cell phone several times looking around. Officer Bridges stated that this conduct looked kind of suspicious to [him]. He explained that based on his experience, he knew that's how a lot people will meet with drug dealers or drug dealers themselves will stand in a parking lot to meet them. When [a]ppellant's vehicle pulled up to the couple in the parking lot and they started talking to each other Officer Bridges stated, it looked like some type of deal was going to go down.

*Id.* at 258.

This Court, however, rejected the trial court's determination that this testimony indicated that the police had reasonable suspicion to stop and detain the appellant. *Id.* We explained that "[t]he record [] reflects

- 10 -

insufficient evidence to justify an 'investigative stop.' Without more, Officer Bridges' observations are consistent with innocent activity and nothing more than a hunch a drug transaction was to transpire." *Id.*

We find *Walton* readily distinguishable from this case. The officer in *Walton* did not explain with any specific or articulable facts regarding how he knew the behavior of the individuals involved in that case was "how a lot of people . . . meet with drug dealers." *See id.* The officer only testified that his conclusion was "based on his experience[,]" *see id.*, but he did not articulate what experiences he had that supported this conclusion. In this case, however, Officer Bogan testified that not only did the behavior of the drivers of the Cadillac and the blue pickup appear identical to other vehicle-related drug transactions he has witnessed, but also that Officer Bogan himself has engaged in similar drug transaction behavior while acting as a drug buyer in undercover narcotics operations.

Additionally, unlike *Walton*, the conduct of the drivers of the Cadillac and blue pickup were not merely consistent with innocent activity. This case included the added step of the driver of the pickup truck exiting his vehicle and entering the front passenger seat of the Cadillac (Appellant's vehicle) so that their interaction was not visible by anyone outside. Thus, in this case the drivers of the Cadillac and the pickup truck exhibited behavior that Officer Bogan specifically knew was, based upon his training and experience,

suspicious behavior.  By contrast, the behavior of the appellant in **Walton** provided no indicia of criminal activity.  **See id.** at 258.

Therefore, we conclude that the record supports the trial court's determination that Officer Bogan's testimony pointed to specific and articulable facts that, in light of the officer's experience, gave him the reasonable belief that the drivers of the Cadillac and blue pickup truck were engaging in a drug transaction.  Accordingly, the trial court did not err in denying Appellant's suppression motion.

Judgment of sentence affirmed.


Judgment Entered.

_____
Joseph D. Seletyn, Esq.
Prothonotary


Date: 8/25/20