J-S29036-21

2021 PA Super 218

COMMONWEALTH OF PENNSYLVANIA : IN THE SUPERIOR COURT OF
: PENNSYLVANIA
Appellant :
:
:
:
v. :
:
:
:
DAVID GALLOWAY : No. 2202 EDA 2020

Appeal from the Order Entered October 16, 2020
In the Court of Common Pleas of Delaware County Criminal Division at
No(s): CP-23-CR-0003594-2019

BEFORE: PANELLA, P.J., KUNSELMAN, J., and STEVENS, P.J.E.[*]

OPINION BY STEVENS, P.J.E.:                    **FILED NOVEMBER 2, 2021**

The Commonwealth appeals[1] from the October 16, 2020 order granting

the pre-trial suppression motion filed by Appellee, David Galloway. After

careful review, we reverse the suppression order and remand for proceedings

consistent with this opinion.

The suppression court summarized the relevant facts of this case as

follows:

> On the evening of December 24, 2018, Trooper Luke
> McIlvaine of the Pennsylvania State Police ("PSP"),
> while working highway patrol on Interstate 95
> Southbound, pulled over a Black Honda Civic bearing
> Delaware license number 541852 for traveling 64 mph

_____

[*] Former Justice specially assigned to the Superior Court.

[1] The Commonwealth certified, pursuant to Pa.R.A.P. 311(d), that the
suppression court's October 16, 2020 order will terminate or substantially
handicap the prosecution.

in a 55 mph zone. The Trooper was working as part of a holiday evening enforcement unit, during which troopers stop many vehicles for traffic violations during busy holiday travel times to create a visible presence on the highway as a message to motorists. While Trooper McIlvaine was conducting the traffic stop, the dashcam video picked up a car in the left bound passing lane passing the trooper and [Appellee's] vehicles at a high rate of speed, and the trooper did not pull over that vehicle. Because of the location of the stop, Trooper McIlvaine approached the passenger side window of the vehicle so that he was not dangerously close to traffic. As Trooper McIlvaine approached, he noticed two occupants in the vehicle, a driver, John DeFebo, and Appellee sitting in the passenger seat. Trooper McIlvaine noticed that Appellee appeared nervous, as [Appellee] was not making eye contact with him, allowing ash from the cigarette he was smoking to fall on him, and [Appellee] was sweating profusely. [T]rooper [McIlvaine] testified that Appellee sweating was suspicious because it was a very cold December evening. Trooper McIlvaine notified the driver of the reason for the stop and took the driver's license, registration, and proof of insurance. The trooper also asked for Appellee's identification, which Appellee said he did not have on him. Trooper McIlvaine asked for Appellee's name, date of birth, and social security number, to ascertain his identification. The check of the driver's information showed that he was the proper owner of the vehicle, his license was not suspended, and he did not have any outstanding warrants. Trooper McIlvaine informed the driver that he would be letting the driver off with a warning on the speeding violation and that he would be free to leave shortly. Notably, however, Trooper McIlvaine never returned the driver's license, registration, nor proof of insurance. The trooper continued to question the driver and [Appellee] over where they were driving from, what they were doing, and the reason that [Appellee] was sweating so much. Both the driver and [Appellee] told the trooper that they had just come from Philadelphia, where they got cheesesteaks at Ishkabibble's on South Street. The

trooper testified that in his experience, Philadelphia is a hub for narcotics distribution, with many drug dealers buying heroin there, since it is better quality heroin, and then driving the heroin to another area to sell it for a profit. Trooper McIlvaine testified that he believed he had a reasonable suspicion of criminal activity and intended to request a dog sniff, though he never followed up with the request. He asked [Appellee] to step out of the car, and when [Appellee] did so, the trooper noticed a marijuana bowl in the center console of the car in plain view. Trooper McIlvaine then conducted a vehicle search and found 1,575 bags of suspected heroin/fentanyl in an Oreo cookie box on the floor of the passenger side. The trooper arrested the driver and [Appellee] and read them **Miranda**[2] warnings.

Suppression court opinion, 1/25/21 at 1-3 (citations to notes of testimony and footnote omitted).

Appellee was subsequently charged with possession with intent to deliver a controlled substance (PWID), possession of a controlled substance, and possession of drug paraphernalia.[3] On February 25, 2020, Appellee filed a pre-trial motion to suppress the contraband found in the vehicle, arguing that "[t]he prolonged nature of the detention was illegal in that it went well beyond the reason for the traffic stop itself . . . and was not supported by a reasonable suspicion[.]" **See** Motion to Suppress, 2/25/20 at ¶ 7. On September 11, 2020, the suppression court conducted a hearing on Appellee's motion, during which Trooper McIlvaine testified. Following the hearing, the

___

[2] **Miranda v. Arizona**, 384 U.S. 436 (1966).

[3] 35 P.S. §§ 780-113(a)(30),(a)(16), and (a)(32), respectively.

suppression court granted Appellee's suppression motion on October 16, 2020. This timely appeal followed.[4]

The Commonwealth raises the following issues for our review:

> 1. Did the [suppression] court err by concluding that the traffic stop ended when Trooper McIlvaine informed the driver he planned to issue a warning?
>
> 2. Did the [suppression] court err by concluding that the trooper lacked reasonable suspicion to conduct an investigative detention beyond the initial traffic stop?
>
> 3. Did the trooper have probable cause and exigent circumstance to search the vehicle without a warrant?
>
> 4. Alternatively, after he observed the marijuana bowl in plain view . . . Trooper McIlvaine had probable cause to obtain a search warrant. Because he could have obtained a warrant, would the suppressed evidence have inevitably been discovered?

Commonwealth's brief at 2-3.

Our standard of review in addressing a suppression court's order granting a suppression motion is well settled.

> When the Commonwealth appeals from a suppression order, we follow a clearly defined standard of review and consider only the evidence from the defendant's witnesses together with the evidence of the

---

[4] The record reflects that the suppression court ordered the Commonwealth to file a concise statement of errors complained of on appeal, in accordance with Pa.R.A.P. 1925(b), on November 19, 2020. The Commonwealth filed its timely Rule 1925(b) statement on December 3, 2020, and the suppression court filed its Rule 1925(a) opinion on January 25, 2021.

prosecution that, when read in the context of the entire record, remains uncontradicted. The suppression court's findings of fact bind an appellate court if the record supports those findings. The suppression court's conclusions of law, however, are not binding on an appellate court, whose duty is to determine if the suppression court properly applied the law to the facts.

Our standard of review is restricted to establishing whether the record supports the suppression court's factual findings; however, we maintain *de novo* review over the suppression court's legal conclusions.

*Commonwealth v. Korn*, 139 A.3d 249, 253-254 (Pa.Super. 2016) (internal citations and quotation marks omitted), *appeal denied*, 159 A.3d 933 (Pa. 2016).

"Both the Fourth Amendment of the United States Constitution and Article 1, Section 8 of the Pennsylvania Constitution guarantee an individual's freedom from unreasonable searches and seizures." *Commonwealth v. Bostick*, 958 A.2d 543, 550 (Pa.Super. 2008) (citation and internal quotation marks omitted), *appeal denied*, 987 A.2d 158 (Pa. 2009). "To secure the right of citizens to be free from such intrusions, courts in Pennsylvania require law enforcement officers to demonstrate ascending levels of suspicion to justify their interactions with citizens to the extent those interactions compromise individual liberty." *Commonwealth v. Reppert*, 814 A.2d 1196, 1201 (Pa.Super. 2002) (citation omitted). This court has recognized three types of interactions between members of the public and the police:

The first of these is a "mere encounter" (or request for information) which need not be supported by any

level of suspicion, but carries no official compulsion to stop or to respond. The second, an "investigative detention" must be supported by a reasonable suspicion; it subjects a suspect to a stop and a period of detention, but does not involve such coercive conditions as to constitute the functional equivalent of an arrest. Finally, an arrest or "custodial detention" must be supported by probable cause.

*Commonwealth v. Way*, 238 A.3d 515, 518 (Pa.Super. 2020) (citation omitted). Thus, pursuant to the Fourth Amendment, a person may not be lawfully seized, either by means of an investigative detention or a custodial detention, unless the police possess the requisite level of suspicion.

In the instant matter, the suppression court found that Trooper McIlvaine lacked reasonable suspicion to continue to detain Appellee following the initial traffic stop. Suppression court opinion, 1/25/21 at 5-6. The suppression court concluded that "at the moment Trooper McIlvaine told the occupants he would give them a warning, the traffic stop ended and [his] initial suspicion d[id] not justify the prolonged questioning and detention of [Appellee]." *Id.* The suppression court further opined:

This was a simple, low level speeding offense that was not investigable outside the initial stop, license check, and either the issuing of a ticket or giving of a warning. This Court believes that Trooper McIlvaine was not presented with sufficient particularized facts to constitute the reasonable suspicion required to continue detaining [the driver] and [Appellee] passed the point of writing a speeding ticket or issuing a warning.

*Id.* at 10.

The Commonwealth contends that the suppression court erred in concluding that Trooper McIlvaine's interaction with Appellee during the traffic stop transitioned into an unlawful investigative detention. Commonwealth's brief at 10-14. The Commonwealth maintains that "[u]p until Trooper McIlvaine removed [Appellee] from the vehicle to request a dog sniff, Trooper McIlvaine was reasonably investigating a traffic stop after witness[ing] the vehicle speeding[,]" and developed the requisite level of suspicion, based on the totality of the circumstances, "to extend the stop further to investigate criminal activity." *Id.* at 15.

It is well settled in this Commonwealth that,

> [a] police officer may detain an individual in order to conduct an investigation if that officer reasonably suspects that the individual is engaging in criminal conduct. This standard, less stringent than probable cause, is commonly known as reasonable suspicion. In order to determine whether the police officer had reasonable suspicion, the totality of the circumstances must be considered. In making this determination, we must give due weight ... to the specific reasonable inferences [the police officer] is entitled to draw from the facts in light of his experience. Also, the totality of the circumstances test does not limit our inquiry to an examination of only those facts that clearly indicate criminal conduct. Rather, even a combination of innocent facts, when taken together, may warrant further investigation by the police officer.

*Commonwealth v. Rogers*, 849 A.2d 1185, 1189 (Pa. 2004).

In *Rodriguez v. United States*, 575 U.S. 348 (2015), the United States Supreme Court examined the permissible scope of an officer's investigation during a traffic stop. The *Rodriguez* Court reasoned:

> A seizure for a traffic violation justifies a police investigation of that violation. A relatively brief encounter, a routine traffic stop is more analogous to a so-called **Terry** [**v. Ohio**, 392 U.S. 1 (1968)] stop ... than to a formal arrest. Like a **Terry** stop, the tolerable duration of police inquiries in the traffic-stop context is determined by the seizure's mission — to address the traffic violation that warranted the stop and attend to related safety concerns. Because addressing the infraction is the purpose of the stop, it may last no longer than is necessary to effectuate th[at] purpose. Authority for the seizure thus ends when tasks tied to the traffic infraction are — or reasonably should have been — completed.

**Rodriguez**, 575 U.S. at 354 (citations and internal quotation marks omitted).

The **Rodriguez** Court recognized that police officers may conduct certain unrelated checks during an otherwise lawful traffic stop, provided they "not do so in a way that prolongs the stop, absent the reasonable suspicion ordinarily demanded to justify detaining an individual." **Id.** at 372.

More recently, the Pennsylvania Supreme Court recognized in **In Interest of A.A.**, 195 A.3d 896 (Pa. 2018), that a police officer may use information gathered during an initial traffic stop to justify a second investigatory detention, regardless of whether the officer has indicated at some point during the initial stop that the subject is free to leave. **Id.** at 898. In reaching this conclusion, the **A.A.** Court reaffirmed this court's decision in **Commonwealth v. Kemp**, 961 A.2d 1247 (Pa.Super. 2008) (**en banc**), noting that the "totality of the circumstances approach allows the court to consider all facts at the officer's disposal and does not require the court to

disregard those adduced during a valid … traffic stop." **A.A.**, 195 A.3d at 907

(citation omitted). The **A.A.** Court further explained that:

> [T]he totality of the circumstances test, by its very definition, requires that **the whole picture** be considered when determining whether the police possessed the requisite cause to stop appellant.
>
> . . .
>
> [W]e confirm that 'all relevant facts' and the 'whole picture' necessarily includes any information learned by a police officer during an initial lawful traffic stop, irrespective of whether or not the officer suggests at some point during that stop that the subject of the stop is free to leave or tells him or her to 'have a good night.'

**Id.** at 909-910 (citation and internal quotation marks omitted; emphasis in

original).

Likewise, in **Rogers**, our Supreme Court held that a trooper had

reasonable suspicion to continue to detain a defendant beyond the initial traffic

stop, where the defendant, **inter alia**, was extremely nervous and shaking;

gave vague answers to the trooper's questions; and his vehicle contained

supplies which the trooper knew from experience were used in the packaging

and distribution of narcotics. **Rogers**, 849 A.2d at 1189–1190. The **Rogers**

Court acknowledged that although there could be innocent explanations for

these circumstances, "reasonable suspicion does not require that the activity

in question must be unquestionably criminal before an officer may investigate

further[, but rather] requires a suspicion of criminal conduct that is reasonable

based upon the facts of the matter." **Id.** at 1190 (emphasis omitted).

- 9 -

Similarly, in the instant matter, our review of the record does not support the suppression court's conclusion that Appellee was subjected to an unlawful investigative detention when Trooper McIlvaine continued to question Appellee after informing the driver that he planned to issue him a warning and he could leave shortly. Viewing the totality of the circumstances, we conclude that Trooper McIlvaine possessed the requisite reasonable suspicion to extend the traffic stop to investigate his concerns that Appellee and the driver were engaged in criminal activity.

The record reflects that the evening of December 24, 2018, Appellee was a passenger in a vehicle stopped by Trooper McIlvaine for traveling 64 m.p.h. in a 55-m.p.h. zone on the I-95 corridor between Delaware and Philadelphia. Notes of Testimony, 9/11/20 at 10, 35. Trooper McIlvaine testified that upon approaching the vehicle, he notified the driver of the reason for the stop and requested his license, registration, and proof of insurance. *Id.* at 15-16, 38. Trooper McIlvaine also requested Appellee's identification, but Appellee indicated he did not have it in his possession. *Id.* at 16-17, 40-41. Thereafter, Trooper McIlvaine took Appellee's name, date of birth, and social security number to properly identify him. *Id.* at 40.

Trooper McIlvaine testified that when the driver handed over his documentation, "his hand was trembling and he could barely give [him] the information." *Id.* at 16. Trooper McIlvaine also testified that Appellee appeared "extremely nervous" during this encounter, "was closed, away from

- 10 -

me" with "his head down," and was "sweating profusely." ***Id.*** at 16, 24, 40-41. Trooper McIlvaine opined that he found Appellee's profuse sweating suspicious because it was a very cold, December evening. ***Id.*** at 23-24. Trooper McIlvaine further noted that Appellee would not make eye contact with him and allowed the ash from the cigarette he was smoking to fall on his lap, instead of out the window. ***Id.*** at 16, 24.

Trooper McIlvaine also informed the driver at the time that they were conducting holiday enforcement and he planned to issue him a warning for speeding and that they would be free to leave shortly. ***Id.*** at 38-39.

Trooper McIlvaine testified that at this point, he requested the driver exit his vehicle and sit on the guardrail near the passenger side window of the patrol cruiser, while Trooper McIlvaine sat in the driver seat and processed his documentation. ***Id.*** at 17-18, 44-45. Trooper McIlvaine stated that he conducts traffic stops in this manner for his own safety and so that he can hear over the loud highway. ***Id.*** Appellee, in turn, remained in the passenger seat of the driver's vehicle. ***Id.*** at 18. Trooper McIlvaine's subsequent check of the driver's documentation revealed that he was the proper owner of the vehicle, his license was not suspended, and he did not have any outstanding warrants. ***Id.*** at 20, 39. Trooper McIlvaine also testified that after running Appellee's information, he learned that his license was suspended and he "had a lengthy criminal history involving drug dealing, [PWID] out of the state of Delaware." ***Id.*** at 21, 23.

We acknowledge that at this point in the interaction Trooper McIlvaine had accomplished the "seizure's mission" in addressing the traffic violation that had warranted the initial stop. *See Rodriguez*, 575 U.S. at 354. Nonetheless, we conclude that this interaction seamlessly transitioned into a second, investigative detention whereby Trooper McIlvaine sought to ask additional questions of Appellee on account of his reasonable suspicion "[t]hat there's probably some type of criminal activity going on." Notes of Testimony, 9/11/20 at 24. Here, when Trooper McIlvaine extended the traffic stop by approaching Appellee to question him, he was aware of the following relevant facts:

Trooper McIlvaine testified that he has conducted over a 1,000 traffic stops on the I-95 corridor and has personally made over 175 narcotics-related arrests. *Id.* at 8. Trooper McIlvaine acknowledged that this stretch of I-95 was well known to be used for narcotics trafficking, whereby individuals purchase high-quality narcotics in Philadelphia that can be sold at significantly higher costs out of state. *Id.* at 30-32.

As discussed, Trooper McIlvaine also personally observed Appellee's extremely nervous and evasive behavior during the initial stop, *see id.* at 16, 23-24, 40-41, and was aware of "his lengthy criminal history involving [PWID] narcotics" in Delaware. *Id.* at 19. Trooper McIlvaine testified that the driver's and Appellee's behavior was "completely out of the norm from what [he] see[s] on normal traffic stops." *Id.* at 24. Trooper McIlvaine stated:

> I've never -- I've never seen people that nervous before and they've had large amount of drugs. So, a passenger in the vehicle should never be that nervous. He's not in trouble for anything. You know what I mean? The guy was stopped for speeding. I told him he was going to get a warning. Normally, a person who's going to get a warning, they become less nervous. Like, oh, I don't have to pay a ticket, thank God. Both occupants were nervous the whole traffic stop, which is way out of the ordinary.

*Id.* at 32

Moreover, Trooper McIlvaine had been provided dubious answers as to why Appellee and the driver had travelled to Philadelphia. The record reflects that while Trooper McIlvaine was verifying the driver's information, the driver told him that he and Appellee had traveled from Delaware to Philadelphia to get cheesesteaks. *Id.* at 19, 45-46. Trooper McIlvaine further testified that the driver stated that he could not afford a speeding ticket. *Id.* at 19, 47. Trooper McIlvaine opined that he found it unusual for someone who is struggling financially to drive from Delaware to Philadelphia, pay for parking, and purchase a cheesesteak on Christmas Eve. *Id.* at 19, 32. Appellee, in turn, initially told Trooper McIlvaine that they went to Philadelphia to Christmas shop, and did not say anything about cheesesteaks until after Trooper McIlvaine observed the driver on his cell phone as he was speaking with Appellee, which led him to infer that the occupants were communicating to get their stories straight. *Id.* at 21-24, 32.

It is well settled in this Commonwealth that that Trooper McIlvaine was warranted to use information gathered during his initial traffic stop to justify

- 13 -

a second investigatory detention, irrespective of the fact that he informed the occupants of the vehicle that they would be free to leave shortly. ***See A.A.***, 195 A.3d at 909-910; ***see also Rogers***, 849 A.2d at 1190.

Based on the foregoing facts of record, we conclude that Trooper McIlvaine had reasonable suspicion that Appellee was engaged in criminal activity sufficient to warrant a second, investigative detention.[5]

Accordingly, we find that the suppression court erred in granting Appellee's pre-trial suppression motion, reverse the suppression court's October 16, 2020 order, and remand this case for trial.

Order reversed. Case remanded for trial. Jurisdiction relinquished.

Judgment Entered.

_Joseph D. Seletyn_

Joseph D. Seletyn, Esq.
Prothonotary


Date: 11/02/2021

---

[5] Considering our disposition, we need not address the Commonwealth's remaining claims.