**IN THE SUPREME COURT OF PENNSYLVANIA**
**MIDDLE DISTRICT**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA, | : | No. 62 MAL 2022 |
| | : | |
| Respondent | : | Petition for Allowance of Appeal |
| | : | from the Order of the Superior Court |
| | : | |
| v. | : | |
| | : | |
| | : | |
| DAVID GALLOWAY, | : | |
| | : | |
| Petitioner | : | |
| | : | |
| | : | |
| | : | |
| | : | |

**<u>DISSENTING STATEMENT</u>**

**JUSTICE WECHT**                    **FILED:  September 6, 2022**

This case presents a number of important questions regarding the reasonableness of certain inferences drawn by a Pennsylvania State Trooper during the course of a traffic stop that likely are to recur in future cases.  As explained below, the trooper in this case developed reasonable suspicion based upon broad, unsupportable assumptions that would apply to anyone in or around Philadelphia or to those driving along a major thoroughfare.  The Superior Court's endorsement of these general assumptions, which this Court declines to review, will undermine constitutional protections against unreasonable searches and seizures, most notably the requirement that suspicion of criminal activity be individualized.  By declining to grant allowance of appeal in this case, this Court permits the Superior Court's endorsement of the trooper's assumptions to become entrenched into Pennsylvania law, denying this Court the opportunity to assess whether such generalized assumptions comport with the requirement of individualized

suspicion. The result of the Court's decision is that suspicion for purposes of constitutional interactions between individuals and law enforcement tallies automatically against anyone in or around Philadelphia or driving along roadways that connect to that city. And there is no reason to believe that police cannot make similar assumptions about other urban areas and highways. In short, the Superior Court's decision threatens the rights of all Pennsylvanians and is worthy of this Court's review. Because the Court passes on the opportunity, I respectfully dissent.

The traffic stop in this case occurred at 7:19 p.m. on Christmas Eve 2018 after Pennsylvania State Police Trooper Luke McIlvaine clocked a black Honda Civic driving nine miles per hour over the posted speed limit of 55 mph on the southbound portion of I-95 in Tinicum Township, Delaware County. Notes of Testimony ("N.T."), Suppression Hr'g, 9/11/2020, at 10. John Difebo, a resident of Wilmington, Delaware, was driving. Trooper McIlvaine later testified that the stop was part of a holiday enforcement unit, which was put together in an effort to reduce the likelihood of traffic accidents by maintaining a visible police presence on the highway during heavy travel periods as a signal to other drivers to slow down. *Id.* at 73, 75. As such, Trooper McIlvaine did not intend to write Difebo a ticket for speeding, which, in any event, would have been about $43 plus any applicable costs. Upon approaching the vehicle, Trooper McIlvaine knocked on the window, identified himself and the reason for the traffic stop, *id.* at 10, asked Difebo for his identification, and immediately informed Difebo that he was only going to give him a warning. *Id.* at 38-39. According to the officer, without prompting, Difebo "immediately blurted out that he was coming from South Street" in Philadelphia. *Id.* at 16.

For safety purposes, Trooper McIlvaine approached the passenger side of the vehicle, where he encountered the petitioner, David Galloway, sitting in the front seat. While waiting for Difebo to retrieve his license, registration, and insurance, Trooper

McIlvaine observed that Galloway was "smoking a fresh cigarette" and "just letting the ash fall on himself." *Id.* at 15-16. Galloway's "eyes were wide, he was closed, away from [the officer] and put his head down." *Id.* at 16. "He was sweating profusely." *Id.* When the officer asked Galloway for his identification, Galloway explained that he did not have it with him, but he provided his name and date of birth. *Id.* at 40, 43; *see also id.* at 50-51 (acknowledging that Difebo also provided a Wilmington address for Galloway, which "check[ed] out"). From the time Trooper McIlvaine activated his lights and sirens, this initial stage of the stop lasted less than three minutes.

After acquiring their information, Trooper McIlvaine asked Difebo to accompany him back to his police vehicle for further questioning, where Difebo was patted down. The officer explained that it is safer for him to conduct highway traffic stops that way for a few reasons: (1) "there's no driver in the vehicle to flee"; (2) he "can hear better" over the highway noise from inside his police vehicle; and (3) he can "make sure [the person being questioned] doesn't have any weapons on him." *Id.* at 17, 45. Difebo "lean[ed] on" the passenger side window of Trooper McIlvaine's vehicle while the officer sat in the driver's seat and confirmed the validity of Difebo's information. *Id.* at 18. During their conversation, Difebo made an offhand remark that he "can't afford a ticket." *Id.* at 19. Difebo also told Trooper McIlvaine that he and Galloway had gone to Ishkabibble's, a South Street restaurant, to bond over cheesesteaks. *Id.* at 18, 47. When Trooper McIlvaine inquired about parking on South Street, Difebo acknowledged that he had to pay to park. Trooper McIlvaine then asked, "isn't that expensive," to which Difebo replied that he was there for less than half-an-hour. *Id.* at 22-23.

By this point the weather was "extremely cold," with the temperature hovering somewhere "between 20 and 30 degrees." *Id.* at 20. This prompted Difebo, a self-described "little guy" who was clad only in jeans and a sweatshirt, to repeatedly express

"how [c]old he is," *id.*, and to ask if he could sit in the police vehicle to get warm, a request that Trooper McIlvaine ignored. *Id.* at 49-52. Difebo was "pacing," "jump[ed] up and down," and stuck his hands into the pockets of his sweatshirt. *Id.* at 49. Trooper McIlvaine processed Difebo's license, registration, and insurance, which revealed no issues. *Id.* at 20, 39. He also conducted a criminal history check on Difebo, which apparently came back clean as well. *Id.* at 21. After completing his investigation of Difebo, Trooper McIlvaine then performed a similar search of Galloway's history. The search did not produce a picture ID, but it did show that Galloway's license was suspended, that he had a few outstanding tickets, and that he "had a lengthy criminal history involving drug dealing" in Delaware, though he was not currently on probation or parole and had no open warrants. *Id.* at 21, 40, 52, 61.

Roughly thirteen minutes into this second phase of the stop, Trooper McIlvaine returned to the Honda to speak with Galloway. He did so for "[s]everal reasons": "[t]o tell [Galloway that] his license is suspended, to confirm that it is his via his social security number and [to] have a conversation with him, not to confirm or deny my suspicions." *Id.* at 23. The first thing Trooper McIlvaine asked Galloway—who was "still sweating in 20 degree weather," "still smoking cigarettes, [and] still ashing all over himself"—was why the pair were in Philadelphia. *Id.* Galloway did not initially make eye contact. Trooper McIlvaine said that Galloway seemed "extremely nervous," "completely out of the norm from what I see on [a] normal traffic stop." *Id.* at 24. Galloway replied that he went to South Street to do some "Christmas shopping." *Id.* At that moment, less than a minute after reapproaching and speaking with Galloway, Trooper McIlvaine believed "[t]hat there's probably some type of criminal activity going on" involving narcotics. *Id.* He promptly went back to his vehicle and called for backup. *Id.*

Less than a minute later, Trooper Beers[1] arrived and spoke with Trooper McIlvaine, who said that Difebo's and Galloway's stories conflicted and, for the first time, relayed that he had suspicions that there might have been a gun in the car. *Id.* at 25. Trooper McIlvaine then asked Difebo for permission to search the vehicle, which Difebo declined. *Id.* at 26. Nevertheless, Trooper McIlvaine returned to Difebo's vehicle "[t]o wait for either a [drug-sniffing] dog or to continue my investigation." *Id.* He then removed Galloway from the vehicle. *Id.* at 26-27. After removing Galloway, Trooper McIlvaine observed a glass "marijuana bowl" in plain view on the center console. *Id.* at 27. When he informed Difebo and Galloway of his discovery, Difebo admitted that the pipe was his. *Id.* at 28. Trooper McIlvaine then decided to search the vehicle. On the floor in front of the passenger seat where Galloway was seated, the officer discovered "1,575 bags of fentanyl inside of [sealed] cookie boxes." *Id.* at 29-30. Difebo and Galloway were arrested, and a syringe was discovered on Difebo's person incident to his arrest. *Id.* at 70. Both men were charged with narcotics-related offenses.

Galloway moved to suppress the physical evidence on the grounds that Trooper McIlvaine lacked reasonable suspicion of criminal activity sufficient to justify extending the traffic stop after declining to issue Difebo a ticket. Trooper McIlvaine testified to the foregoing facts, and then offered the following broad assumptions in an attempt to substantiate his suspicions. Based upon his "training and experience," he noted that "the Philadelphia area . . . is a high drug, high crime area." *Id.* at 19. He also explained that the particular stretch of I-95 where he stopped Difebo is a known drug-trafficking corridor. He elaborated that "Philadelphia has the best fentanyl and heroin around. People come from out of state all the time, Delaware, Maryland, Cecil County, Wilmington. They purchase the narcotics in the Philadelphia area because it's cheaper and it's better. They

---

[1]     Trooper Beers' first name does not appear in the record.

take it back to where they're from . . . and sell it for a profit because it's worth double, triple in that case." *Id.* at 30-31. To that end, he noted,

> a lot of times you'll see somebody who has a valid license driving in a valid vehicle. In this case, [that] is exactly what I saw[,] Mr. Difebo has a valid license, the vehicle is val*Id.* The Defendant Mr. Galloway is suspended. This is just in case they do get stopped for something like this, you know, they don't get looked into too much because they'll have a valid license.

*Id.* at 31. After estimating that it would have taken Difebo thirty to forty-five minutes to drive to South Street from his home in Wilmington, Trooper McIlvaine opined that is "not financially feasible" for someone experiencing "financial hardships" to make that drive for a cheesesteak. *Id.* at 19, 32. Trooper McIlvaine speculated that the two men may have been messaging each other to get their stories straight, *id.* at 32, but he conceded that there was no direct evidence of any communications between them for the duration of the stop. See *id.* at 21, 22 (indicating that Difebo "was on the phone at some points in time" (but not "too much"), and that the officer couldn't tell who Difebo might have been "communicating with or anything").

The Court of Common Pleas of Delaware County, per the Honorable James P. Bradley, granted Galloway's motion. The court concluded that Trooper McIlvaine "did not even attempt to perform any of" the "tasks remaining for the traffic infraction" after accomplishing the purpose of the stop. Tr. Ct. Op. at 5. "Instead, he embarked on tasks wholly unrelated to the initial traffic stop without any level of legal suspicion required for a detention." *Id.* at 5-6. As evidenced by the court's independent examination of the officer, the court was especially skeptical of his speculative reasoning. See N.T., Suppression Hr'g, 9/11/2020, at 72-79. The court discounted Trooper McIlvaine's testimony, finding that his assertions fell "well short of reasonable suspicion." Tr. Ct. Op. at 10.

The Superior Court reversed in a unanimous, published decision. *Commonwealth v. Galloway*, 265 A.3d 810 (Pa. Super. 2021). The panel disagreed with the trial court's conclusion that Trooper McIlvaine subjected Galloway to an unlawful investigative detention when he "continued to question [Galloway] after informing [Difebo] that he planned to issue him a warning and he could leave shortly." *Id.* at 816. Although the court acknowledged that "Trooper McIlvaine had accomplished the 'seizure's mission' in addressing the traffic violation that had warranted the initial stop" after confirming the validity of Difebo's documentation, *Id.* (quoting *Rodriguez v. United States*, 575 U.S. 348, 354 (2015)), the court concluded that the officer "possessed the requisite reasonable suspicion to extent the traffic stop to investigate his concerns that [Galloway] and [Difebo] were engaged in criminal activity," *id.*, and that "this interaction seamlessly transitioned into a second[] investigative detention whereby Trooper McIlvaine sought to ask additional questions of [Galloway] on account of his reasonable suspicion '[t]hat there's probably some type of criminal activity going on.'" *Id.* at 817 (quoting N.T., Suppression Hr'g, 9/11/2020, at 24).

The panel highlighted the officer's designation of Philadelphia and I-95 as "well known" conduits "for narcotics trafficking"; both men's nervous demeanor; Difebo's statement that he could not afford a speeding ticket; and the results of Galloway's criminal history check. *Id.* The court reasoned that Trooper McIlvaine was justified in extending his investigation because he "had been provided dubious answers" about the men's reasons for travelling to Philadelphia; whereas Difebo told the officer that they had gone for cheesesteaks, Galloway separately said that he went Christmas shopping. Additionally, the court indicated that Trooper McIlvaine had "observed [Difebo] on his cell phone as he was speaking with [Galloway], which led him to infer that the occupants were communicating to get their stories straight." *Id.* Taking these facts and inferences

together, the court held that Trooper McIlvaine's suspicions were reasonable and that his second investigatory detention was lawful. Accordingly, the court reversed the suppression order and remanded the case for trial.

Problematically, in my view, in reversing the suppression order, the Superior Court read the record from the suppression hearing in the light most favorable to the Commonwealth, even though Galloway had prevailed below. In that posture, an appellate court "may consider only the evidence of the defense and so much of the evidence for the Commonwealth as remains uncontradicted when read in the context of the record as a whole." *Commonwealth v. Mistler*, 912 A.2d 1265, 1268-69 (Pa. 2006). Likewise, a reviewing court must give effect to every reasonable inference in the defendant's favor. *Cf. Commonwealth v. Perez*, 249 A.3d 1092, 1103 (Pa. 2021) (explaining that the reasonableness of inferences relied upon in establishing a prima facie case of criminal culpability must be assessed under a "more-likely-than-not" standard); *Id.* at 1103-04 (holding that the lower courts erroneously drew numerous inferences in the defendant's favor that were unsupported by the preliminary hearing record). And it may not reassess the trial court's credibility determinations. Galloway makes a compelling case that these principles were not followed here.

From an appellate perspective, it appears that the trial court's concerns about Trooper McIlvaine's credibility were reasonable and supported by the record. In that regard, Trooper McIlvaine's shifting explanations for removing Galloway from the vehicle were noteworthy. For instance, he testified that he pulled Galloway out of the car because Galloway might have fled if left inside alone, despite the fact that Galloway had waited patiently in the car for twenty minutes while it was running without any indication that he might take off. N.T., Suppression Hr'g, 9/11/2020, at 68-69. Alternatively, he said that he removed Galloway from the car because he wanted to secure it while waiting for a

drug-sniffing dog, even though he never requested that a dog be brought to the scene. *Id.* at 64-65. He also speculated that there might have been a gun in the car, which he derived from Galloway's criminal history alone, another apparent justification for detaining him.

Trooper McIlvaine's suspicion that criminal activity was afoot due to the pair's apparent "nervousness" likely was a consequence of questionable inferential reasoning. The officer testified that Galloway was sweating profusely when he approached the vehicle, and he found this unusual because it was so cold outside. But he did not consider whether the heat was turned up inside Difebo's car or the fact that Galloway was wearing a hat, a heavy hooded-sweatshirt, and sweatpants. *Id.* at 67-68. It seems unlikely that a person would produce the amount of sweat that Galloway evidently exhibited just in the sixty seconds it took for Trooper McIlvaine to pull over the car and begin speaking to the men. Given Galloway's history with drugs and the fact that drug paraphernalia was found nearby, it sems more reasonable to conclude that he was under the influence of one or more controlled substances at the time, which might explain his excessive sweating, nervous demeanor, and absentminded mishandling of his cigarette ash. Similarly, Trooper McIlvaine asserted that Difebo was nervous throughout the stop, but the only thing he could point to as evidence of Difebo's supposedly nervous demeanor after their initial interaction were his efforts to keep warm in the freezing weather by "pacing" next to the officer's vehicle. *Id.* at 49. The record reflects Difebo's several earnest attempts to seek shelter from the elements during the twenty minutes he was left standing on the shoulder, and thus supports the conclusion that he simply was acting as any underdressed person stuck out in the cold might. Indeed, Trooper McIlvaine acknowledged that Difebo was truthful and polite throughout their interaction, which belies

any suggestion that he was being evasive. See *id.* (noting that Difebo wasn't "hesitating" when answering questions, "but he wanted to leave").

Perhaps most troubling, though, was Trooper McIlvaine's dismissal of Difebo's story about traveling to Philadelphia to buy cheesesteaks because he thought Difebo was experiencing "financial hardships" and because he broadly considered the city as a whole to be a "high drug, high crime" area. The Superior Court endorsed the trooper's characterizations. As a threshold matter, general designations of neighborhoods as "high crime" areas seems to have become a box-checking heuristic for law enforcement in search-and-seizure cases. While designating localized portions of an area as prone to criminal activity may be one thing, labeling an entire major city in that way is another thing altogether. To the extent that tagging neighborhoods, much less entire cities and interstate thoroughfares, as "high crime" has become rote in the suppression context, it undermines the requirements of individualized suspicion and disserves the millions of law-abiding citizens who live in and travel to and from those places, who are no less entitled to the Constitution's protections because of that unfortunate statistical circumstance, the standards for which we have never defined. We would do well to dissuade law enforcement from depending too much on such amorphous characteristics. *See Commonwealth v. Barr*, 240 A.3d 1263, 1291 (Pa. Super. 2020) (Strassburger, J., joined by Bender and Lazarus, JJ., concurring) (noting "discontent with the Commonwealth's reliance on the 'high-crime area' factor in support of a finding of probable cause" and opining that "the status of the neighborhood at issue as a 'high-crime area' should not be relevant to the probable cause determination"); *id.* ("People who live in poor areas that are riddled with crime do not have fewer constitutional rights than people who have the means to live in 'nice' neighborhoods."). Stated otherwise, and just as concerning, relying upon such a premise means that probable cause or reasonable

suspicion begins to tally against each and every person who steps foot in Philadelphia, whether for leisure, business, or residency, simply by being present, which erodes the requirement of individualized suspicion.

Specifically with regard to Difebo's fiscal situation, Trooper McIlvaine inferred that Difebo was experiencing "financial difficulties" from a comment he made about being unable to "afford" a ticket. But the recording bears out that this comment clearly arose in the context of a discussion Difebo and the officer were having about how many points Difebo had on his Delaware license. Difebo had incurred ten points as of that day and was afraid that he would lose his license if he received a speeding ticket. *Id.* at 46-48. In Delaware, a driver's license is suspended when he or she incurs fourteen or more points, with less severe penalties starting at twelve points. Driving more than nine miles per hour over the speed limit incurs a four-point penalty in Delaware, which takes certain moving violations committed in other jurisdictions into account when assessing points and issuing problem-driver improvement actions. In that light, it certainly would have been reasonable for Difebo, who was caught driving nearly ten miles over the speed limit, to seek the officer's sympathies by saying that he couldn't "afford" a ticket in the colloquial sense of being unable to bear losing his license for the mandatory minimum term of four months—not that he literally couldn't pay the fine.

What's more, Trooper McIlvaine's suggestion that Difebo was acting suspiciously because he was doing "pretty expensive" things—like driving his stepfather about thirty miles so that Galloway could go Christmas shopping, paying for less than an hour of parking, and buying a cheesesteak meal for "$15 or $16," *id.* at 48—while professing to be unable to afford a speeding ticket demands a leap of logic so broad as to be beyond a creditable justification for the prolonged detention of the two men. Nonetheless, the Superior Court credited this reasoning as well, and concluded that it was reasonable for

Trooper McIlvaine to infer that Difebo and Galloway were lying because they had "provided dubious answers" for their trip to Philadelphia. *Galloway*, 265 A.3d at 817. In particular, the court noted that Galloway "initially told Trooper McIlvaine that they went to Philadelphia to Christmas shop, and did not say anything about cheesesteaks until after Trooper McIlvaine observed [Difebo] on his cell phone as he was speaking with [Galloway], which led him to infer that the occupants were communicating to get their stories straight." *Id.* But the recording belies Trooper McIlvaine's and the court's supposition that Difebo was feeding Galloway a story "as [the officer] was speaking with" Galloway. *Id.* Difebo stood directly in front of the dashcam with his hands in his pockets during the officer's brief interactions with Galloway. And it would have been difficult, if not impossible, for Galloway to steal a glance at his phone while being interrogated by Trooper McIlvaine, who held a flashlight on Galloway, without the officer witnessing it. The officer made no mention of seeing Galloway on his phone in his testimony, and he conceded that he had no evidence that the two actually had communicated.

Trooper McIlvaine's suspicions also turned upon Galloway's criminal history, another factor that weighed heavily in the Superior Court's analysis. But the officer only learned about Galloway's drug-dealing past after having completed the purpose of the investigative detention. In other words, Trooper McIlvaine was satisfied that Difebo was who he claimed to be, that he had no outstanding warrants or tickets, and that he was driving with a valid license in a properly registered and insured vehicle. The trooper had no intention of writing Difebo a ticket, so for all intents and purposes, the reason for the traffic stop had been resolved and Difebo should have been free to leave. But Trooper McIlvaine held onto Difebo's license and other documents so that he could pursue a separate investigation into Galloway, even though Galloway could not have been cited for any traffic offenses as a passenger in Difebo's vehicle. This was not a "seamless

transition," as the Superior Court put it, and the officer's vague speculation "[t]hat there's probably some type of criminal activity going on" is not normally the type of articulable suspicion necessary to detain a person for questioning. *See id.* On these facts, it appears that Trooper McIlvaine likely lacked the quantum of cause necessary to effectuate another investigative detention, and thus exceed the permissible scope of the search. Since he discovered Galloway's criminal history only after beginning his second investigation, neither that history nor anything else that Trooper McIlvaine gleaned from his further interactions with Galloway from that moment on could retrospectively support the subsequent, unlawful seizure.

In sum, when he decided to prolong the investigative detention, all that Trooper McIlvaine had in his ken were the specific instances of Difebo's and Galloway's apparent nervousness. The officer's general belief that Philadelphia is a source for low-cost narcotics and that some people transport drugs between the city and Delaware on I-95 did not constitute individualized suspicion that Difebo and Galloway were engaged in criminal activity; the same "facts" could have applied to just about any driver on that road that evening. Because their detention largely was based upon Trooper McIlvaine's hunch—an accurate hunch, but a hunch nonetheless—it seems that the trial court was justified in suppressing the fruits of his unlawful search. The Superior Court disagreed, but it evidently did so after erroneously applying the standard of review, drawing inferences in favor of the non-prevailing party, and over-relying upon baseless supposition unsupported, and in some instances flat-out contradicted, by the evidence. These significant errors warrant granting allowance of appeal. That they occurred in a published decision makes our intervention all the more necessary.

Additionally, the Superior Court's decision appears to be in conflict with United States Supreme Court precedent. In *Rodriguez*, the Supreme Court explained that the

constitutional authority for a traffic stop ends "when tasks tied to the traffic infraction are—or reasonably should have been—completed." 575 U.S. at 354. "Beyond determining whether to issue a traffic ticket, an officer's mission includes 'ordinary inquiries incident to [the traffic] stop,'" such as "checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance." *Id.* at 355 (quoting *Illinois v. Caballes*, 543 U.S. 405, 408 (2005)) (emphasis added). Running a criminal background check on a passenger is not an inquiry ordinarily incident to a traffic stop for speeding, particularly one in which the driver's information "checks out" and the purpose of the stop has been fulfilled (in this case with a warning and assurances that the men were free to leave). The pertinent question is not whether an officer may request a passenger's identification during a traffic stop, but whether it is reasonable to prolong a traffic stop after its purpose—*i.e.*, investigating the driver and deciding whether to write a ticket—has been fulfilled in order to conduct a general background investigation of a passenger for potential issues wholly unrelated to the stop. Galloway offers a persuasive argument that it is not reasonable, and this Court's ability to clarify the law in this area, which is of great importance to the public, alone justifies further consideration.

As for Galloway's second issue presented, although the Superior Court determined that the extended seizure was lawful, it did not then consider whether the Commonwealth's warrantless search of Difebo's vehicle was supported by probable cause and exigent circumstances, as now is required under *Commonwealth v. Alexander*, 243 A.3d 177 (Pa. 2020). In his petition for allowance of appeal, Alexander set forth a simple legal proposition:  to justify a warrantless search of a vehicle, a police officer must possess probable cause that a crime has been committed and that evidence of the crime likely will be found inside the vehicle, and also must show that some exigency exists which

would preclude the officer from obtaining a search warrant. Even assuming, *arguendo*, that Trooper McIlvaine had probable cause to search Difebo's vehicle after observing marijuana paraphernalia in plain view (though not the physical plant or odor indicating its recent use)—which is a dubious proposition in light of our recent decision in *Commonwealth v. Barr*, 266 A.3d 25 (Pa. 2021)—on this record it seems that exigent circumstances plainly were lacking. Trooper McIlvaine had backup support on the scene; Galloway and Difebo had been detained and handcuffed; and the vehicle was about to be impounded. There was nothing preventing the officer from obtaining a warrant to search the vehicle and its contents, including the sealed boxes in which the narcotics were secreted.

Galloway states succinctly that "[t]he Commonwealth set forth no exigent circumstances to justify a warrantless search," and that the Superior Court "erred by failing to apply *Alexander*." PAA at 28-29. Both assertions inarguably are true. Although the Commonwealth belatedly claimed that Trooper McIlvaine's "need to ensure his safety created an exigent circumstance that warranted an immediate search of the vehicle because [Galloway] was not restrained," Commonwealth's Superior Ct. Br. at 21, the Commonwealth never asserted exigency on those or any other grounds at the suppression hearing or in any trial court filings. And Alexander was decided nearly a year before the lower court's decision in this case, so it cannot be said that the panel was unaware of it. Nonetheless, the court failed to address *Alexander*'s applicability to these facts. While Galloway did not proffer a full-throated merits analysis of this question in his petition, he was not required to do so at this stage. The claimed deficiencies of the Commonwealth's case are apparent from these minimal contentions. Finally, I note that Galloway has not waived this issue. Galloway plainly asserted that Trooper McIlvaine lacked even reasonable suspicion for the prolonged detention, so he could not have

satisfied *Alexander*'s dual requirements in any event. See Motion to Suppress, 2/25/2020, ¶ 7. Of course, as the prevailing party at the suppression hearing, Galloway bore no burden of preservation before the Superior Court, so that court's failure to address *Alexander*, which the Commonwealth had invoked in an effort to distinguish Galloway's circumstances, is inexplicable. Having lost before the suppression court, it was the Commonwealth's burden to affirmatively demonstrate exigency on appeal. On this record, it probably could not.

For the foregoing reasons, I would grant *allocatur* in this case. At a minimum, Galloway has demonstrated that he was entitled to the benefit of *Alexander*. More importantly, however, Galloway has presented a compelling argument that our lower courts are endorsing articulations of reasonable suspicion that likely are diminishing the constitutional rights of motorists and passengers in Pennsylvania. Because the Court declines to review this important issue, I respectfully dissent.

Justice Donohue joins this dissenting statement.