J-S44045-22

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| MICHAEL PATRICK BAKER | : | |
| | : | |
| Appellant | : | No. 696 MDA 2022 |

Appeal from the Judgment of Sentence Entered December 16, 2021
In the Court of Common Pleas of Lancaster County Criminal Division at
No(s): CP-36-CR-0002938-2018,
CP-36-CR-0006497-2019

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| MICHAEL PATRICK BAKER | : | |
| | : | |
| Appellant | : | No. 697 MDA 2022 |

Appeal from the Judgment of Sentence Entered December 16, 2021
In the Court of Common Pleas of Lancaster County Criminal Division at
No(s): CP-36-CR-0002938-2018,
CP-36-CR-0006497-2019

BEFORE: PANELLA, P.J., McLAUGHLIN, J., and PELLEGRINI, J.[*]

MEMORANDUM BY PELLEGRINI, J.: **FILED: FEBRUARY 22, 2023**

---

[*] Retired Senior Judge assigned to the Superior Court.

Michael Patrick Baker (Baker) appeals[1] from the December 16, 2021 judgments of sentence imposed by the Court of Common Pleas of Lancaster County (trial court) following his convictions for second-degree murder, two counts of burglary, two counts of robbery and two counts of conspiracy.[2] He challenges the denial of his motion to dismiss pursuant to Rule 600 of the Rules of Criminal Procedure, the denial of his motions to suppress evidence and the sufficiency of the evidence to support his convictions. We affirm.

**I.**

We glean the following facts from the certified record. Dennis Pitch (the victim) was murdered in his home between the late evening and early morning hours of December 2 and 3, 2016. The victim's body was discovered by his

---

[1] Baker filed identical notices of appeal at each of the lower court dockets and we have consolidated the matters *sua sponte*. ***See Commonwealth v. Johnson***, 236 A.3d 1141, 1148, (Pa. Super. 2020) (*en banc*) (approving the filing of separate but identical notices of appeal as compliant with the dictates of ***Commonwealth v. Walker***, 185 A.3d 969 (Pa. 2018)); ***see*** Pa. R.A.P. 513. Baker's notices of appeal purported to appeal from the denial of his post-sentence motions. However, notice in a criminal case properly lies from the judgment of sentence. ***Commonwealth v. Shamberger***, 788 A.2d 408, 410 n.2 (Pa. Super. 2001) (*en banc*).

[2] 18 Pa.C.S. §§ 2502(b), 3502(a)(1), 3701(a)(1)(i), 3701(a)(1)(iv) & 903(a)(1). Baker was convicted of these offenses at Case 2938-2018. At Case 6497-2019, he was convicted of intimidation of a witness and simple assault. 18 Pa.C.S. §§ 4952(a)(3) & 2701(a)(1). The cases were tried together as the intimidation and assault charges were related to the murder case. While he filed a notice of appeal at both dockets, the issues he raises on appeal relate only to Case 2938-2018. Because he does not challenge his convictions in Case 6497-2019, we discuss the facts of that case only to the extent they are relevant to the issues he raises in Case 2938-2018.

brother and stepson on December 4, 2016, after they were alerted that the victim had not shown up for work the day before. He had sustained four gunshot wounds as well as bruising and abrasions. There were no signs of forced entry into the home but several rooms had been ransacked. Law enforcement recovered 9-millimeter shells from the home as well as BBs that appeared to be from birdshot.

Through the investigation, law enforcement developed Brandon Bills (Bills) as a suspect in the murder. Bills lived on the same street as the victim. The Pennsylvania State Police (PSP) recovered cell phone tower data from three towers in the vicinity of the victim's home for three days surrounding the murder and identified two phone numbers of interest. The first belonged to Kristopher Smith (Smith), one of Baker's co-defendants, who also lived nearby the victim. At the time of the homicide, Smith was working as a confidential informant. The other number had interacted with Smith's phone at least three times on December 2, 2016, and had an area code from Delaware. Officers suspected this number belonged to Bills because his mother lived in Delaware.

Officers spoke to Smith about the phone numbers and he said that the Delaware phone number belonged to Bills. He also reported that he had heard that the victim was planning to withdraw a large amount of money from his retirement account to avoid losing it in his divorce. Other witnesses reported that in the days prior to the murder, the victim had approximately $3,000 in

cash on his person, which he showed to several acquaintances. The victim did not keep money in bank accounts and was known in the small community to show rolls of cash when he went to stores or the gas station.

After further reviewing phone records for the first two weeks in December, police determined that the Delaware phone number was used in Philadelphia and Delaware during that time period and was not used near the murder scene other than on the night of the murder. The phone number was registered to an individual not associated with Bills and he did not live or work in Philadelphia. Based on this information, law enforcement believed that the number did not belong to Bills. They did determine that the registered owner of the phone number was Baker's mother.

After being confronted with the results of the investigation into the Delaware number, Smith admitted that the number did not belong to Bills. He said it belonged to a friend named Billions from Delaware County, but he did not know his real name. PSP Trooper Jonathan Potoka (Trooper Potoka) then interviewed Baker in September 2017 while he was incarcerated on a different offense. Baker said that the Delaware phone number belonged to him. He said that he knew Smith through mutual acquaintances and had visited him in the Lancaster area in the winter of 2016. He denied knowing Bills, the victim and the victim's brother and had not heard anything about the murder. When confronted with his cell phone activity on the night of the murder, Baker said that must have been the night he visited Smith. He called Smith multiple

times when he got lost driving in the area. He denied any involvement in the murder.

A small, wooded area separated the back of the victim's home from the Gospel Tabernacle Church. Investigators recovered surveillance footage of the church's parking lot that showed Smith's vehicle entering the property at approximately 1:25 AM on December 3, 2016. The vehicle left the view of the camera and re-entered while leaving the church property ten minutes later. Investigators also recovered surveillance video from a nearby gas station that showed Smith's vehicle in the parking lot at approximately 9:20 PM on December 2, 2016. Smith left the vehicle for a few minutes and other individuals could be seen moving in the passenger seat and backseat. Finally, a neighbor who lived across the street from the victim had a motion-activated camera that would record any vehicles driving on the street. The camera did not activate around the time of the murder.

PSP Trooper Chadwick Roberts (Trooper Roberts) interviewed Bills in January 2018 while he was incarcerated on unrelated charges. He initially denied any knowledge of or involvement in the murder. On further questioning, he said that on the night of the murder, he was picked up at his home by Smith. Two other individuals from Philadelphia were also in the

vehicle, one of whom had dark hair. Bills did not know their names but identified Baker as one of the individuals in a photo array the following day.[3]

Bills testified about the group's activities that night at trial. He had known Smith for approximately seven years and they lived near each other in Narvon. On the night of the murder, Smith picked Bills up at his home to drive him to the gas station. When he entered the vehicle, Baker was sitting in the front passenger seat and Lyles was in the rear passenger seat. They first went to a hardware store and everyone except Bills exited the vehicle. Bills stayed in the car smoking marijuana and methamphetamine and heard an alarm buzzer sound coming from the direction of the store. Baker, Smith and Lyles then returned to the vehicle and they left. Bills testified that the other three did not have any items with them from the hardware store. The group proceeded to the gas station where Smith exited the car and went into the store for a few minutes. They then drove to a second gas station and Smith again went inside alone before returning to the vehicle.

At that point, the group proceeded to the Gospel Tabernacle Church and parked along the side of the building. They got out of the vehicle and Smith retrieved two sawed-off shotguns from the trunk and handed one to Baker. Baker, Smith and Lyles were wearing black clothes, gloves and masks. Smith

---

[3] Bills also identified Christopher Lyles (Lyles) and Smith in photo arrays as the individuals who were in the car that night.

told Bills to wait at the vehicle and that they were "going to do a lick." N.T., 9/23/21, at 944-45. Baker, Smith and Lyles then proceeded into the woods in the direction of the victim's home. While waiting at the car, Bills heard two or three faint gunshots coming from the direction where the three men had headed. The men returned to the vehicle quickly after the gunshots after being gone for between five and ten minutes. Smith and Baker both had their shotguns with them when they returned to the car. None of the men appeared to be carrying anything from the house.

The four men got back into the vehicle and left the church. While in the car, Smith commented that "it didn't go well as planned." *Id.* at 950. Smith then dropped Bills off at his home and left with Baker and Lyles. Two individuals were at Bills' home at the time but he did not tell them what had happened.[4] Bills later learned that the victim had been murdered but did not go to the police because he was afraid of retaliation.

Bills admitted what he knew about the murder when he was interviewed over a year later while incarcerated on unrelated charges. He testified he was not offered anything by the Commonwealth or law enforcement in exchange for the information at the initial interview. He said he decided to speak to police because he knew the victim and thought he was a nice person and he

_____

[4] One of the individuals testified at trial that on the night of the murder, Bills returned to his home looking very agitated and shaken.

felt safer while incarcerated. A few months later, Baker, Smith, Lyles and Bills were charged with homicide and related offenses for the victim's murder. By the time of Baker's trial, Bills had reached an agreement with the Commonwealth that it would withdraw the homicide charge in exchange for his testimony.

In August 2018, the PSP obtained and executed a search warrant for Baker's phone records signed by magisterial district judge Raymond Sheller (MDJ Sheller). Eighteen months earlier, when the initial investigation was underway, MDJ Sheller, who lived on the same street as the victim at the time of the murder, had been interviewed by police canvassing the area. The following day, he provided the PSP with video from his home surveillance system. One of his cameras recorded the street but investigators did not find any relevant information on the video. The video was disclosed to Baker in discovery. Alleging a conflict of interest, Baker filed a motion to suppress the phone records seized pursuant to the warrant signed by MDJ Sheller. After hearing argument, the trial court denied the motion. The video provided by MDJ Sheller was not admitted into evidence or referenced at Baker's trial.

Detective Anthony Vega (Detective Vega), who was working with the FBI as part of the Cellular Analysis Survey Team, testified as an expert in historical cell phone analysis. He analyzed the call detail records from Baker's phone number and mapped the data onto the towers that the number connected with to determine the geographical area where the phone was

located around the time of the victim's murder. The cell tower usage indicated that Baker's phone travelled from Philadelphia to Narvon on December 2, 2016, between 5:43 PM and 7:37 PM. Between approximately 8:30 PM and 9:15 PM, the phone connected to towers in the vicinity of the victim's street and the area where the hardware store was located. Baker's phone connected with Smith's phone multiple times before 9:15 PM, which was also located in the Narvon area. It did not connect to any towers between 9:15 PM and 3:29 AM the following day, when it began connecting again to towers in the Philadelphia area. Finally, Lyles' cell phone usage data also showed travel from Philadelphia to Narvon and connections with Smith's phone during these same time periods.

At trial, the Commonwealth presented testimony from Brandin Devonshire (Devonshire), who had been incarcerated with Baker and Smith in 2019. At that time, Baker told Devonshire that he was angry with Smith because he did not corroborate Baker's story when speaking with police. Baker had told officers that he was in Narvon on the night of the murder but Smith had said Baker was not in town that night. Devonshire reported this information to the police but was not promised anything by the Commonwealth regarding his own criminal cases in return for the proffer. Later that year, Devonshire was re-incarcerated on an unrelated charge. One day when he entered his cell, Baker was inside with two other inmates. Baker told Devonshire that he should not have given his statement to police and that

he should tell them that he lied and refuse to testify. All three inmates then assaulted Devonshire.

Following a jury trial, Baker was convicted of the above-mentioned charges. The trial court sentenced him to an aggregate term of life in prison with a consecutive term of 23.5 to 60 years' incarceration. Baker filed a timely post-sentence motion which was denied. He timely appealed and he and the trial court have complied with Pa. R.A.P. 1925.

## II.

Baker presents four issues on appeal: whether the trial court abused its discretion in denying his motion to suppress evidence seized pursuant to a search warrant signed by MDJ Sheller; whether the trial court abused its discretion in denying his motion to dismiss the charges pursuant to Rule 600; whether the trial court abused its discretion in denying his motion to suppress Bills' identification of him in an overly suggestive photo lineup; and whether the evidence was sufficient to support his convictions when no direct evidence established that he had entered the victim's home.

## A.

We begin with Baker's argument that the trial court should have suppressed evidence seized based on a warrant signed by MDJ Sheller.[5] Baker

_____

[5]

> An appellate court's standard of review in addressing a challenge
> to a trial court's denial of a suppression motion is limited to

*(Footnote Continued Next Page)*

argues that MDJ Sheller was a potential witness in the case because he lived on the victim's street and provided his home surveillance footage to police while they were engaged in routine canvassing in the days following the murder. Over a year-and-a-half later, MDJ Sheller signed search warrants authorizing the Commonwealth to obtain cell phone subscriber information from Sprint and Verizon Wireless. Baker contends that MDJ Sheller should have recused himself based on a conflict of interest from his earlier participation in the case, and his failure to recuse warranted suppression of the evidence seized pursuant to the warrants.[6]

_____

> determining whether the factual findings are supported by the record and whether the legal conclusions drawn from those facts are correct. [Because] the prosecution prevailed in the suppression court, we may consider only the evidence of the prosecution and so much of the evidence for the defense as remains uncontradicted when read in the context of the record as a whole. Where the record supports the factual findings of the trial court, we are bound by those facts and may reverse only if the legal conclusions drawn therefrom are in error.

***Commonwealth v. Postie***, 110 A.3d 1034, 1039 (Pa. Super. 2015) (citation omitted).

[6] The search warrants and supporting affidavits are not contained in the certified record on appeal. "Our law is unequivocal that the responsibility rests upon the appellant to ensure that the record certified on appeal is complete in the sense that it contains all of the materials necessary for the reviewing court to perform its duty." ***Commonwealth v. Holston***, 211 A.3d 1264, 1276 (Pa. Super. 2019) (citation omitted). However, Baker conceded at the suppression hearing that his argument does not implicate the four corners of the warrants and whether sufficient facts to establish probable cause were set forth therein. N.T., 10/24/19, at 19-24. Accordingly, we decline to find waiver based on their exclusion from the record.

It is well-established that a search warrant must be supported by probable cause as determined by a neutral and detached magistrate. ***See***, ***e.g.***, ***Commonwealth v. Leed***, 186 A.3d 405, 413 (Pa. 2018); Pa.R.Crim.P. 203(B). The Rules of Conduct for Magisterial District Judges require MDJs to recuse when their "impartiality might be reasonably questioned," including in cases in which the MDJ has "personal knowledge of facts that are in dispute in the proceeding" or is "likely to be a material witness in the proceeding." Pa. St. Mag. Dist. J. 2.11(A)(1), (A)(2)(d) & (A)(6)(c).

In ***Commonwealth v. Sharp***, 683 A.2d 1219 (Pa. Super. 1996), which Baker relies on in support of his argument, we addressed whether the fruits of a warrant should be suppressed when the MDJ who issued the warrant was married to one of the officers involved in the investigation. The lead opinion began by acknowledging that the Standards of Conduct for District Judges require recusal in instances where the MDJ's "impartiality might be reasonably questioned," including instances where the MDJ's spouse is an officer involved in the proceedings. ***Id.*** at 355. While it agreed that there may be an appearance of impartiality warranting recusal, the lead opinion found that suppression was an extreme remedy and not warranted when there was no actual prejudice resulting from the MDJ's involvement in the matter. ***Id.*** at 356 n.3. Further, it opined that the absence of probable cause to support the warrant was not *per se* evidence of bias.

However, the *Sharp* court was divided on the issue of whether the MDJ should have recused herself by reason of actual or apparent conflict of interest. In a concurring statement, one jurist stated that the MDJ should have recused herself but believed that she acted in good faith and did not conclude that there was any actual bias on her part. *Id.* at 361 (Saylor, J., concurring). The other member of the panel would have held that the MDJ violated the Standards of Conduct by failing to recuse herself, and that her involvement in the case created, at minimum, an appearance of impropriety. *Id.* at 362 (Popovich, J., concurring in part and dissenting in part). Moreover, he would have found that the MDJ was actually biased based on her approval of the warrant on a deficient affidavit of probable cause. *Id.* at 363 (Popovich, J., concurring in part and dissenting in part). The division on the issue of recusal was ultimately moot because all members of the panel agreed that the warrant was not supported by probable cause and suppressed the fruits of the search on that basis.

The facts regarding MDJ Sheller's involvement in this matter are undisputed. MDJ Sheller lived on the same street as the victim, and during routine canvassing of the area after discovering the body, officers spoke to him at his home. He informed them that he did not know the victim and had not seen or heard anything suspicious. The next day, MDJ Sheller provided law enforcement with footage of the street from his personal surveillance system. Officers did not find anything relevant to the investigation in this

footage, though it was turned over to the defense in discovery. Over a year-and-a-half later, MDJ Sheller signed search warrants for phone records related to numbers of interest in the investigation. Based on his earlier involvement in the case, Baker argued that there was at least an appearance of impropriety that required MDJ Sheller to recuse himself from considering the warrant applications.[7]

Under these unique circumstances, the trial court did not abuse its discretion in denying the motion to suppress. MDJ Sheller's involvement in the case was exceedingly brief and predated the search warrants by over a year. He was interviewed by law enforcement during routine canvassing and did not have any personal knowledge of the crime or relationship to the victim. While he provided surveillance footage from his home, the footage did not reveal anything of relevance to the investigation. Put simply, MDJ Sheller did not contribute any information to the investigation that required him to serve as a witness in the case, let alone as a "material witness," and he had no personal knowledge of any disputed facts in the case. **See** Pa. St. Mag. Dist. J. 2.11(A)(1), (A)(2)(d) & (A)(6)(c). Further, there is no evidence of either an actual or apparent conflict of interest that affected his ability to assess the probable cause supporting the warrants. **See Sharp**, **supra**. Finally, by

---

[7] Baker subpoenaed MDJ Sheller to testify at the suppression hearing but the subpoena was quashed prior to the hearing.

failing to challenge whether the warrant's affidavit established probable cause, Baker concedes that no prejudice resulted from MDJ Sheller's involvement in this case. For all these reasons, no relief is due.

**B.**

Next, we consider whether the trial court erred in denying Baker's motion to dismiss the charges under Rule 600.[8] The instant case was initiated by Baker's arrest on April 23, 2018, and was set for trial on September 19, 2019. At that time, Baker had not received the full discovery from the Commonwealth and the matter was continued. He argues that Rule 600's time limitations had expired by the initial trial date and that the trial court abused its discretion in refusing to dismiss the charges.[9]

Under Rule 600, a case must be called to trial or a plea must be tendered within 365 days from the date on which the criminal complaint was filed.

---

[8]

> Our standard of review in a Rule 600 issue is whether the trial court abused its discretion. Our scope of review when determining the propriety of the trial court is limited to the evidence in the record, the trial court s Rule 600 evidentiary hearing, and the trial court s findings. We must also view the facts in the light most favorable to the prevailing party. . . .

***Commonwealth v. Lewis***, 804 A.2d 671, 673 (Pa. Super. 2002) (citations omitted).

[9] Baker proceeded to trial in September 2021 after lengthy delays resulting from judicial emergencies declared in response to the covid-19 pandemic. He does not contend that any delay after the initial trial date in 2019 caused a violation of Rule 600.

- 15 -

Pa.R.Crim.P. 600(A)(2)(a).[10]  When computing the time that has elapsed, "periods of delay caused by the defendant," also known as excludable time, are excluded from the length of time that has elapsed from when the complaint was filed.  Pa.R.Crim.P. 600(C)(2); ***Commonwealth v. Maddrey***, 205 A.3d 323, 327 (Pa. Super. 2019) ("When computing the number of pretrial days attributable to the Commonwealth under this rule, certain delays are excluded, such as those occasioned by defense postponements, by express defense waivers of Rule 600, by the unavailability of the defendant or defense counsel, and an inability to locate and apprehend the defendant."). Excusable time, or periods of Commonwealth delay during which the Commonwealth exercised due diligence, is also not counted in the Rule 600 calculation.  ***Commonwealth v. Moore***, 214 A.3d 244, 248-49 (Pa. Super. 2019); Pa.R.Crim.P. 600(C)(1).  Thus, when a continuance is granted, the subsequent order should "record to which party the period of delay caused by the continuance shall be attributed, and whether the time will be included in

_____

[10] Rule 600 was formerly numbered as Rule 1100 and was amended and renumbered on April 1, 2001.  "However, because much of the rule's substance remained consistent throughout the amendment, [Pennsylvania courts have] continued to apply our precedents interpreting former Rule 1100 to the analogous provisions of Rule 600, sometimes employing Rule 600 nomenclature to facilitate discussion of Rule 1100 precedents." ***Commonwealth v. Barbour***, 189 A.3d 944, 946 n.1 (Pa. 2018).  For consistency, we refer to Rule 600 in our discussion of earlier precedents.

or excluded from the computation of the time within which trial must commence in accordance with this rule." Pa.R.Crim.P. 600(C)(3)(a)(ii).

Our review of the certified record and docket sheet reveals the following. 514 days elapsed between the filing of the complaint and September 19, 2019, the trial date at issue. The case proceeded through the preliminary hearing and formal arraignment stages and an informal status conference was held on October 16, 2018. At that time, the trial court issued an order scheduling a second status conference for December 7, 2018, and, consistent with the Rule, included a finding that "[t]he time between the date of this Order and December 7, 2018, shall run against the Defendant for purposes of Rule 600. . . ." *See* Order, 10/16/18.

On the date of the second status conference, Baker filed a motion for continuance that included language explicitly waiving his right to be tried within 365 days of the case's initiation. *See* Motion for Trial Continuance and Waiver, 12/7/18. The trial court then scheduled Baker's trial for two weeks beginning on Monday, September 9, 2019. The scheduling order stated: "Upon agreement of counsel, and the proper continuance forms having already been filed, all time is attributable to the Defendant." Scheduling Order, 12/14/18. Baker filed his omnibus pretrial motion on April 1, 2019. Finally, on September 9, 2019, the trial court scheduled a hearing on Baker's omnibus pretrial motion for October 25, 2019, and continued the trial date to March 2020. Scheduling Order, 9/9/19.

At the hearing on his Rule 600 motion, Baker acknowledged the above-mentioned orders specifically attributed lengthy periods of delay to the defense. Nevertheless, he argued that under ***Commonwealth v. Mills***, 162 A.3d 323 (Pa. 2017), the Commonwealth's failure to provide discovery prior to the initial trial date resulted in non-excusable delay notwithstanding his continuance requests and waiver. He further argues that ***Commonwealth v. Edwards***, 595 A.2d 52 (Pa. 1991), compels dismissal based on the Commonwealth's willful or negligent failure to pass discovery prior to September 19, 2019.

In ***Mills***, our Supreme Court held that "time attributable to the normal progression of a case simply is not 'delay' for the purposes of Rule 600." ***Mills***, ***supra***, at 325. There, the court was concerned with a 174-day period between the filing of the complaint and a status conference, during which neither party was prepared to proceed to trial. It concluded that this period of "normal progression" was not excludable from the Rule 600 calculation. In ***Edwards***, the Commonwealth had not provided discovery by the scheduled trial date despite the defense's timely request and the trial was continued. Because the sole reason for the delay was the Commonwealth's uncontested failure to pass discovery it already had in its possession, the court concluded that it had not acted with due diligence to bring the defendant to trial. ***Edwards***, ***supra***, at 55.

Crucially, the defendants in **Mills** and **Edwards** did not request the continuances at issue or explicitly waive their rights to be tried within the time limitations of Rule 600. This is plainly not the case here, where Baker requested two continuances, explicitly waived his right to be tried with 365 days, and the trial court noted in its orders that the relevant time periods were excludable. Regardless of the Commonwealth's due diligence, delays requested by Baker cannot be included in the time calculation for Rule 600 purposes. Pa.R.Crim.P. 600(C)(2). As a result, the 338 days between October 16, 2018, and September 19, 2019, is delay attributable to Baker. With the exclusion of these continuances requested by the defense, only 176 days not attributable to delay by Baker passed before his initial trial date. Thus, the trial court did not abuse its discretion in denying his motion to dismiss pursuant to Rule 600.

**C.**

Next, Baker argues that the trial court abused its discretion by denying his motion to suppress Bills' identification of him in the photo array. When he initially spoke with police, Bills informed them that the person in the vehicle on the night of the murder had black hair. Law enforcement then showed Bills a photo array in which Baker was bald with a long black beard. After viewing the array, Bills began referring to Baker as the person with the black beard. Additionally, Baker argues that the other individuals in the photo array did not have beards of similar length and that he was the only individual who

appeared to not be wearing a shirt. Baker also highlights that the lineup process was not recorded and suggests the troopers involved could have influenced Bills' identification. Based on these circumstances, he contends that the photo array process was unduly suggestive and Bills' identification of him should have been suppressed.

Suppression of an identification is proper only when the procedure is "**so impermissibly suggestive** as to give rise to a very substantial likelihood of irreparable misidentification." *Id.* at 900 (citation omitted, emphasis in original). Not all variances between photos in an array are grounds for suppression. "Photographs used in line-ups are not unduly suggestive if the suspect's picture does not stand out more than the others, and the people depicted all exhibit similar facial characteristics." *Commonwealth v. Mbewe*, 203 A.3d 983, 986-87 (Pa. Super. 2019) (citation omitted); *see Commonwealth v. Davis*, 17 A.3d 390, 394 (Pa. Super. 2011) (holding that photo array was suggestive when it contained three photos, one of which was a third party already known to the witness, and the other an individual who appeared markedly different from the defendant). While "[e]ach person in the array does not have to be identical in appearance," the photos "should all be the same size and should be shot against similar backgrounds." *Commonwealth v. Kendricks*, 30 A.3d 499, 504 (Pa. Super. 2011) (citations omitted). However, incidental variances in the photos are

insufficient to establish undue suggestiveness. **Commonwealth v. Kearney**, 92 A.3d 51, 66 (Pa. Super. 2014).

Baker argues that the photo array was overly suggestive because (1) his photo was not consistent with Bills' initial description of the dark-haired perpetrator, as he was bald; (2) he appears to be the only individual in the array who is not wearing a shirt; and (3) the other subjects in the array do not have sufficiently similar facial characteristics and beards to Baker, making his own photo stand out among the different subjects.[11] However, even though the photo array in question was entered as an exhibit at the suppression hearing, he has not ensured that it was included in the certified record.[12] It is well-established that an appellant bears the burden of ensuring that all documents necessary to appellate review are contained in the certified record. **See** note 6, **supra** (citing **Commonwealth v. Holston**, 211 A.3d 1264, 1276 (Pa. Super. 2019)). Without examining the photos in question, we are unable to determine whether the compilation of photos was unduly

---

[11] Trooper Roberts' testimony at the suppression hearing established that all eight individuals in the array had beards and the trial court, after viewing the array, determined that it was not suggestive. **See** N.T., 10/24/19, at 37; Opinion, 3/31/22, at 12. Baker's argument centers on whether the other individuals' beards were sufficiently similar such that he did not stand out among the others.

[12] This Court took the additional step of contacting the trial court prothonotary to see if the photos had been lodged with the record. It did not have copies of the array.

suggestive or whether Baker's photo stood out compared to the others. Accordingly, this issue is waived.[13] **Commonwealth v. Stiles**, 143 A.3d 968, 978 (Pa. Super. 2016) (quoting **Commonwealth v. Manley**, 985 A.2d 256, 263-64 (Pa. Super. 2009) (finding suppression issue related to photo array waived when the photos were not included in the certified record)).

## D.

Finally, Baker challenges the sufficiency of the evidence to support his convictions, arguing that the Commonwealth failed to establish beyond a reasonable doubt that he entered the victim's home on the night in question.[14]

_____

[13] To the extent that Baker attempts to cast suspicion on the procedure because the array was not audio or video recorded, the trial court considered these arguments after Trooper Roberts was cross-examined at length at the suppression hearing. Based on Trooper Roberts' testimony, it was satisfied that the interview and procedure used was not suggestive. Opinion, 3/31/22, at 11-12. This Court may not disturb these factual and credibility findings on appellate review, as they are supported by the transcript of the suppression hearing. **See Postie**, **supra.** Finally, while Baker refers to Bills' trial testimony in support of his conclusion that he was coached during the photo array, this testimony is outside our scope of review, which is confined to the evidence adduced at the suppression hearing. **Commonwealth v. Way**, 238 A.3d 515, 518 (Pa. Super. 2020).

[14] Our standard of review is well-settled:

> The standard we apply in reviewing the sufficiency of the evidence is whether viewing all the evidence admitted at trial in the light most favorable to the verdict winner, there is sufficient evidence to enable the fact-finder to find every element of the crime beyond a reasonable doubt. In applying [this] test, we may not weigh the evidence and substitute our judgment for the fact-finder. In addition, we note that the facts and circumstances established by the Commonwealth need not preclude every possibility of

*(Footnote Continued Next Page)*

Relying on the "incontrovertible physical facts rule," he argues that the version of events posited by the Commonwealth at trial was logically impossible. Baker's Brief at 21 (citing **Commonwealth v. Newman**, 470 A.2d 976 (Pa. Super. 1984)). He contends that the victim could not have been killed and his house ransacked during the ten-minute period when Smith's car was parked at the Gospel Tabernacle Church. He argues that the perpetrator was likely someone known to the victim based on the positioning of the victim's body in the home and the lack of forced entry. Because he believes this version of events is equally likely, he argues that the evidence did not support his guilt beyond a reasonable doubt.

> We have explained the incontrovertible physical facts rule as follows:
>
> [W]here the testimony of a witness is contradicted by incontrovertible physical facts, the testimony of such witness cannot be accepted, it being either mistaken or false, and a verdict based on it will not be sustained. Courts are not required to believe that which is contrary to human experience and the laws of nature, or which they judicially know to be incredible. However, *the incontrovertible physical facts rule can be applied only where the facts are positive, clear, indisputable and certain*.

**Newman**, **supra**, at 979 (citations omitted, emphasis added). "Where the evidence offered to support the verdict is in contradiction to the physical facts,

---

> innocence. Any doubts regarding a defendant's guilt may be resolved by the fact-finder unless the evidence is so weak and inconclusive that as a matter of law no probability of fact may be drawn from the combined circumstances.

**Commonwealth v. Lopez**, 57 A.3d 74, 79 (Pa. Super. 2012) (citation omitted).

in contravention to human experience and the laws of nature, then the evidence is insufficient as a matter of law." ***Commonwealth v. Widmer***, 744 A.2d 745, 751 (Pa. 2000).

Additionally, we note that "[t]he Commonwealth may sustain its burden of proving every element of the crime beyond a reasonable doubt by means of wholly circumstantial evidence." ***Commonwealth v. Gause***, 164 A.3d 532, 541 (Pa. Super. 2017) (citation omitted). "Finally, the trier of fact while passing upon the credibility of witnesses and the weight of the evidence produced, is free to believe all, part or none of the evidence." ***Id.*** On appeal, this court evaluates the full record to determine whether sufficiency evidence was presented to support each element of the crime charged; however, we do not second-guess the jury's factual determinations.

Here, Baker's convictions are well-supported by the evidence adduced at trial. Bills' testimony placed Baker at the crime scene around the time of the victim's death and he heard multiple gunshots coming from the victim's home while Baker and his co-conspirators were in that area. His testimony was corroborated by cell phone data placing Baker in Narvon on the night of the crime, even though he lived in Philadelphia, and Baker's admission to being in Narvon on the night in question. Baker's phone communicated with Smith's and was in the same area as Lyles' phone on the night of the murder. Surveillance video from the gas station and church further supported Bills' description of the group's activity on the night in question and a neighbor's

home surveillance video established that no vehicles approached the victim's home from the front at the time of the murder. BBs or birdshot consistent with a shotgun were recovered from the home, and Baker was carrying a shotgun when he walked into the woods and returned ten minutes later.

The Commonwealth introduced aerial photos of the victim's home and the Gospel Tabernacle Church that showed only a small, wooded area separating the two properties. The crime scene investigator tasked with photographing the area testified that she walked from the church to the house within a minute or two. Thus, it was not "contrary to human experience and the laws of nature" for the jury to conclude that the perpetrators could cross that distance twice and ransack the home within ten minutes, particularly when they were attempting to speedily commit the crimes and avoid detection. **Newman**, **supra**. Viewing all evidence in the light most favorable to the Commonwealth, the jury was entitled to conclude that Baker and his co-conspirators believed the victim had a significant amount of cash in his home, entered the home in search of the money, and killed the victim in the process. The record amply supports Baker's convictions.

Judgments of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: <u>2/22/2023</u>