J-A07042-23

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| Appellant | : | |
| | : | |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| JONATHAN EDWARD BOLDT | : | No. 1786 EDA 2022 |

Appeal from the Order Entered July 1, 2022
In the Court of Common Pleas of Monroe County Criminal Division at
No(s): CP-45-CR-0002584-2021

BEFORE:  DUBOW, J., McLAUGHLIN, J., and McCAFFERY, J.

MEMORANDUM BY McCAFFERY, J.:　　　　　　**FILED SEPTEMBER 22, 2022**

The Commonwealth appeals from the order entered in the Monroe County Court of Common Pleas, which suppressed inculpatory statements made by Jonathan Edward Boldt (Appellee) to police absent **Miranda**[1] warnings.[2]  The Commonwealth argues that the trial court (1) did not correctly apply the test for custodial interrogation when it improperly focused on the

---

[1] **Miranda v. Arizona**, 384 U.S. 436 (1966).

[2] The Commonwealth filed a certification that the suppression order "will substantially handicap the prosecution of" Appellant pursuant to Pa.R.A.P. 311(d).  **See** Commonwealth's Statement in Compliance with Pa.R.A.P. 311(D), 7/12/22; **see also Commonwealth v. Williams** 165 A.3d 994, 995 n. 1 (Pa. Super. 2017) (noting that the Commonwealth may appeal an interlocutory order suppressing evidence when it provides a certification within its appeal that the order substantially handicaps the prosecution) (citation omitted).

police officers' subjective intent, rather than whether Appellee reasonably believed he was free to leave to determine whether he was in custody, and (2) failed to address the fact that Appellee was not subject to interrogation. After the review of the record, we affirm in part, reverse in part, and remand for further proceedings.

The facts underlying Appellee's arrest are as follows.[3] On the night of September 29, 2021, Pocono Township Police were dispatched to the Brookdale Recovery Center (Brookdale). The Victim, an 18-year-old female patient, had arrived at Brookdale earlier that same day. *See* N.T., 10/19/21, at 5-6. Appellee introduced himself to the Victim by offering her a cigarette. *See id.* at 6-7. After dinner, Appellee offered to take the Victim for a walk around the facilities. *See id.* at 11-12. The Victim claimed that Appellee led her to a secluded area off a wooded trail within the territory of the facility, where there was no camera surveillance. *See id.* at 12-15. He then purportedly sexually assaulted her. *See id.* at 16-20. The incident was reported to Brookdale staff, who called police.

Several officers from the Pocono Township Police Department responded to the reported assault. Appellee's interaction with the responding officers was recorded on the officers' body camera (body cam) video. The body cam

_____

[3] We glean these facts from Appellee's preliminary hearing because the matter was decided on a suppression challenge and a trial has not taken place. Notably, the Victim testified at the preliminary hearing.

- 2 -

footage, as well as the preliminary hearing transcript, was admitted at the suppression hearing as the sole evidence regarding Appellee's statements to police. *See* N.T., 3/18/22, at 12. We summarize the footage as follows.[4] Appellee's first on-camera encounter was with Officer Michael Scicutella, who frisked him. *See* Scicutella 1 at 00:00. When Appellee appeared to walk away from the officer, Officer Scicutella directed him to return. *Id.* at 00:44-00:50. Officer Scicutella then escorted Appellee, guiding him by the arm, toward Officers Aron Anglemeyer and Thomas Moser in the facility's parking lot. *See* Moser at 00:00-00:13; Anglemeyer 1 at 00:01-00:18. Officer Scicutella told Appellee to "hang out" with the two officers, and Officer Anglemeyer directed Appellee to have a seat on the bumper of the police cruiser. Anglemeyer 1 at 00:12-00:25. From this point on, Officers Anglemeyer and Moser guarded Appellee.

Officer Anglemeyer told Appellee that they had limited information and asked him whether he knew why the police may have been called. *See* Anglemeyer 1 at 00:47-00:55. Appellee responded that all he knew was that

---

[4] The body cam footage is included on a flash drive, and comprised of 11 videos from the perspective of five different Pocono Township Police Department officers. To address the Commonwealth's claim on appeal, we will refer to the following videos: (1) ARAnglemeyer_202109292002 (Anglemeyer 1), (2) ARAnglemeyer_202109292042 (Anglemeyer 2), (3) ARAnglemeyer_202109292116 (Anglemeyer 4), (4) MichaelScicutella_202109292001 (Scicutella 1), and (5) ThomasMoser_202109292002 (Moser).

he had been told four times by Brookdale staff to stay away from the women in the facility. *Id.* at 00:55-01:29. Appellee asked to use Officer Anglemeyer's phone to call his wife, but the officer refused. *Id.* at 01:32-01:42. Appellee told the officers he was angry because one of the women in the facility called him a "sexual predator." *Id.* at 02:15-02:24. As Appellee became more agitated, Officer Anglemeyer told him to hang tight and sit on a rock to calm down. *Id.* at 02:28-02:43. When Officer Anglemeyer asked what could have happened that night to require the police, Appellee responded that he had told a story and used the word "cunt." *Id.* at 6:58-7:13. He stated that two women complained about him and facility staff subsequently told him to stay 60 feet away from the female patients. *See id.* at 7:13-7:59. The officers informed Appellee they would give him a ride after they gathered his belongings from the facility. *Id.* at 8:40-9:00.

For nearly an hour, Appellee chatted with the officers in a conversational manner and paced around the patrol car. Moser at 10:11-1:03:00. At one point, he attempted to walk over to a nearby volleyball court, but the officers told him to "stay over here, buddy," and he complied. *Id.* at 11:35-11:45. Appellee repeatedly expressed impatience regarding the fact that he had to remain at the facility, threatening to leave and go to a hotel. *See* Anglemeyer 1 at 11:55-12:45. The officers briefed Appellee that they would help him retrieve his phone and wallet and offered to take him to a hotel later. *Id.* at 12:45-13:04.

Meanwhile, out of Appellee's earshot, Officer Anglemeyer had a conversation near another patrol car with Officer Scicutella and Detective James Wagner, who was on the phone. *See* Anglemeyer 2 at 03:00-06:49. Detective Wagner instructed the officers to question Appellee before he could "get cold feet" and "lawyer up." *Id.* at 03:55-04:08. Detective Wagner asked Officer Anglemeyer to question Appellee "if he had sex with [the Victim] and confront him about the allegations." *Id.* at 05:00. Officer Anglemeyer told Officer Scicutella that he would tell Appellee that Officer Scicutella went to get his clothes and attempt to talk to Appellee. *Id.* at 06:57-07:03.

Officer Anglemeyer returned to Appellee and began to discuss Appellee's prior derogatory comments, stating, "I know you told me about the cunt thing," when before the officer had said anything else, Appellee, unprompted, blurted out that he had sex with an 18-year-old "girl" that night too. Anglemeyer 2 at 09:15-09:30. He asked the officer, "Is that what you were about to say?" *Id.* at 09:23-09:25. Officer Anglemeyer responded, "yes," and asked Appellee what led to that. *Id.* at 09:25-09:51. Appellee then described the incident in detail. *Id.* at 9:30-12:05.

Later, Appellee asked to sit in the back of the patrol car, because he was cold. *See* Moser at 1:01:48. The officers left the car door cracked open and complied with Appellee's request to turn the lights off in the car. *Id.* at 1:03:25-1:04:19. Appellee then grew impatient and shouted that he wanted "to get the fuck out of here." *Id.* at 1:05:30-1:05:45. The officers asked

Appellee to stay calm and jokingly claimed they would put him in handcuffs. *Id.* at 1:05:45-1:05:56. Appellee began to pace around the patrol car, eventually stating that he would leave after "one more lap." *Id.* at 1:06:45-1:07:20. The officers told Appellee to remain by the car and convinced him not go into the facility to get his belongings. *Id.* at 1:07:20.

Appellee voluntarily went back into the patrol car again while urging the officers to take him away from the facility. *See* Moser at 1:07:30-1:07:50. Officer Moser closed the self-locking door. *Id.* at 1:07:56. Appellee told the police officers to hurry and questioned what Officer Scicutella was doing that was preventing them from leaving. *Id.* at 1:10:10-1:12:00. Appellee then asked to be let out of the car as he was tired of waiting. *Id.* at 1:12:27. Officer Moser did not comply with Appellee's request, and told him to wait "one sec" because he had to talk to Officer Anglemeyer. *Id.* at 1:12:27-1:12:44. Appellee questioned whether what the officers were saying was true and made a comment expressing disbelief that there were four police officers present. *Id.* at 1:13:20-1:13:36.

The officers eventually let Appellee out of the car to speak with Detective Wagner. *See* Moser at 1:13:55. Detective Wagner told Appellee that the Victim had reported that he had raped her. *See* Anglemeyer 4 at 00:12. The detective questioned Appellee about the accusations, and Appellee recounted the events from that day. *See* Moser at 1:15:30-1:28:18. Appellee continued

to express impatience, stating that he would march into the facility "right now and get [his] shit." *Id.* at 1:18:05.

Detective Wagner then directed Officer Moser to go with Appellee to gather his belongings from the facility. Moser at 1:28:27. As Appellee led Officer Moser toward Brookdale's lobby, the officer advised Appellee to "keep [his] mouth shut" and not "cause issues" for himself. *Id.* at 1:28:53-1:29:10. Officer Moser warned Appellee that if he began to yell and cause a disturbance, he would put him in handcuffs. *Id.* at 1:29:14-1:29:15. After obtaining his belongings, Appellee threw a peace sign up with his hand and exited the lobby carrying his suitcases. *Id.* at 1:30:28. Appellee placed his suitcases in the patrol car and told the officers, "all right bros, let's get the fuck out of here." *Id.* at 1:31:50-1:31:52.

The officers did not leave and repeatedly told Appellee to "hang tight." Moser at 1:33:16-1:36:02. While sitting in the back of the patrol car, Appellee questioned whether he would be permitted to leave the facility. *Id.* at 1:41:05-1:41:25. Officer Moser reassured Appellee that he would leave because he was sitting in the back of the vehicle uncuffed. *Id.* at 1:41:25-1:41:35. Officer Moser then let Appellee out of the car to have a cigarette. *Id.* at 1:47:30. Within minutes, Detective Wagner returned, told Appellee to put his cigarette out, and directed Appellee to go with him. *Id.* at 1:52:00. Detective Wagner then frisked and handcuffed Appellee. *Id.* at 1:52:10-1:53:15. The detective began to administer *Miranda* warnings, advising

Appellee that he had the right to remain silent and that anything he said could and would be used against him in a court of law. *Id.* at 1:53:16-1:53:23. He did not inform Appellee of his right to an attorney. *Id.*

Appellant was then taken to the police station and charged with rape, involuntary deviate sexual intercourse (IDSI), sexual assault, indecent assault (two counts), and indecent exposure.[5] On January 10, 2021, Appellee filed an omnibus pretrial motion, seeking, *inter alia*, suppression of his statements made in violation of *Miranda*. *See* Appellee's Omnibus Pre-Trial Motions, 1/10/22, at 5-8 (unpaginated). The trial court conducted a suppression hearing on March 18, 2022, at which time the Commonwealth submitted into evidence a thumb drive containing the body cam footage from five different officers and the preliminary hearing transcript. *See* N.T., 3/18/22, at 6-7. The court ordered that Appellee's motion to suppress evidence would be taken under advisement and adjudicated based solely on the preliminary hearing transcript and the body cam footage. *See id.* at 10.

On May 26, 2022, the trial court held a limited video conference to announce its rulings on Appellee's pretrial motions. Relevant herein, the court granted Appellee's motion to suppress all of his statements to police absent *Miranda* warnings. *See* N.T., 5/26/22, at 3-5. The court specifically found

_____

[5] 18 Pa.C.S. §§ 3121(a)(1), 3123(a)(1), 3124.1, 3126(a)(1)-(2), and 3127(a), respectively.

the officers never intended to allow Appellee to leave, and that Appellee was "never properly *Mirandized*." *See id.* at 3-4. Although the trial court entered the order on May 26th, the order was not mailed to the parties until July 1, 2021 due to a clerical error. *See* Criminal Docket at 7; *see also* Statement Pursuant to Pa.R.A.P. 1925(a), 9/9/21, at 2.

On July 12, 2022, the Commonwealth filed a notice of appeal. On July 15, 2022, the trial court directed the Commonwealth to file a Pa.R.A.P. 1925(b) concise statement of errors complained of on appeal. *See* Order, 9/15/22. The Commonwealth filed a Rule 1925(b) concise statement on July 25, 2022. On September 9th, the trial court issued a statement indicating that it was unable to fully address the errors alleged by the Commonwealth because the Commonwealth had not requested the transcript from the May 26, 2022, suppression proceeding. *See* Statement Pursuant to Pa.R.A.P. 1925(a) at 2-3. The trial court requested this Court waive the Commonwealth's arguments due to its failure to request a transcript. *See id.* at 3.

The Commonwealth raises the following issue for our review:

Did the trial court err in suppressing [Appellee's] statements?

Commonwealth's Brief at 4.

We begin by addressing the trial court's request that we waive the Commonwealth's argument for failure to request the May 26, 2022, hearing transcript. The Commonwealth contends that "there was no waiver of the

issue where the transcripts were obtained and are available for appellate review." Commonwealth's Brief at 7. The Commonwealth argues that the trial court's reasoning, which relied on Pa.R.A.P. Rule 1911(d), was misplaced because Rule 1911(d) "is a rule of appellate procedure dealing with appellate review, not the [t]rial [c]ourt's review of its own record or its own reasoning." *Id.* at 10. Further, the Commonwealth argues that "a transcript was unnecessary as the entire reasoning of the [t]rial [c]ourt for suppression was the police made a knowing misrepresentation to a defendant." *Id.* (internal quotation marks omitted).

Here, on September 12, 2022 — three days after the trial court issued its Rule 1925(a) statement — the Commonwealth filed motions for transcription regarding the March 18th and May 26th hearings. Those transcripts were then made part of the certified record.

We find this delay in requesting a transcript does not preclude us from addressing the alleged errors under the Pennsylvania Rules of Appellate Procedure. Pursuant to Pa.R.A.P. 1922, an appellant "**may** file a request for transcripts under Pennsylvania Rule of Judicial Administration 4007 **prior to or concurrent** with the notice of appeal." Pa.R.A.P. 1922(a) (emphasis added). Also, Pa.R.A.P. 1911 requires an appellant to request a transcript "in the time prescribed by Rules 4001 *et seq.* of the Pennsylvania Rules of Judicial Administration." Pa.R.A.P. 1911(a). However, it should be noted that the Rules of Judicial Administration do not set forth an explicit time frame in which

an appellant must request a transcript. *See* Pa.R.J.A. Nos. 4001-4016. Instead, the Rules of Judicial Administration establish deadlines by which a court reporter or transcriptionist must respond to requests for transcripts. *See* Pa.R.J.A. 4011(A). When an appellant fails to take the necessary action for "the preparation of the transcript," an appellate court "may take such action as it deems appropriate, which may include dismissal of the appeal." Pa.R.A.P. 1911(d).

Notwithstanding the Commonwealth's delay in requesting the transcripts, the certified record now includes the transcripts of the March 18th and May 26th hearings. As mentioned above, the May 26th hearing includes the trial court's explanation for granting Appellee's motion to suppress. Accordingly, we conclude that the certified record is sufficient to allow meaningful review of the Commonwealth's claims, and we decline to find that waiver is appropriate. *See Commonwealth v. Hood*, 872 A.2d 175, 178 (Pa. Super. 2005) (holding "the lack of a Rule 1925(a) opinion is not always fatal to [this Court's review] because we can look to record to ascertain" trial court's reasoning). Therefore, we will address the merits of the Commonwealth's claims.

Turning to the Commonwealth's substantive claim, we note that our standard of review in addressing a trial court's grant of a suppression motion is well-settled:

> When the Commonwealth appeals from a suppression order, we follow a clearly defined standard of review and consider only

- 11 -

the evidence from the defendant's witnesses together with the evidence of the prosecution that, when read in the context of the entire record, remains uncontradicted. The suppression court's findings of fact bind an appellate court if the record supports those findings. The suppression court's conclusions of law, however, are not binding on an appellate court, whose duty is to determine if the suppression court properly applied the law to the facts.

Our standard of review is restricted to establishing whether the record supports the suppression court's factual findings; however, we maintain *de novo* review over the suppression court's legal conclusions.

*Commonwealth v. Galloway*, 265 A.3d 810, 813 (Pa. Super. 2021) (citation and emphasis omitted), *appeal denied*, 284 A.3d 870 (Pa. 2022). Moreover, even if we disagree with the court's conclusions, we may affirm "on any valid basis appearing of record." *In Interest of N.B.*, 187 A.3d 941, 945 (Pa. Super. 2018) (*en banc*) (citation omitted).

The Commonwealth contends that the trial court erred by focusing solely on the police officer's subjective intent to restrict Appellee's movement and failed to consider whether Appellee reasonably believed his "freedom of action" was being restricted — that is, whether he "actually believed he was in police custody" — or whether he was subject to interrogation. *See* Commonwealth's Brief at 14-19.

"Both the Fourth Amendment of the United States Constitution and Article 1, Section 8 of the Pennsylvania Constitution guarantee an individual's freedom from unreasonable searches and seizures." *Commonwealth v. Bostick*, 958 A.2d 543, 550 (Pa. Super. 2008) (citation & internal quotation marks omitted). The courts of this Commonwealth have recognized "three

levels of interaction between the police and citizens: (1) a mere encounter, (2) an investigative detention, and (3) a custodial detention." *Commonwealth v. Spence*, 290 A.3d 301, 314 (Pa. Super. 2023) (citation omitted).

> A mere encounter can be any formal or informal interaction between an officer and a citizen, but will normally be an inquiry by the officer of a citizen. The hallmark of this interaction is that it carries no official compulsion to stop or respond.
>
> In contrast, an investigative detention, by implication, carries an official compulsion to stop and respond, but the detention is temporary, unless it results in the formation of probable cause for arrest, and does not possess the coercive conditions consistent with a formal arrest. Since this interaction has elements of official compulsion it requires reasonable suspicion of unlawful activity. In further contrast, a custodial detention occurs when the nature, duration and conditions of an investigative detention become so coercive as to be, practically speaking, the functional equivalent of an arrest.

*Id.* (citation omitted).

*Miranda* warnings are required only for the third-level interaction — a custodial detention or arrest. *Spence*, 290 A.3d at 314.

> The United States Supreme Court has held that, before law enforcement officers question an individual who has been taken into custody or has been deprived of his freedom in any significant way, the officers must first warn the individual that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed. However, these special procedural safeguards are required only where a suspect is both taken into custody and subjected to interrogation.

*Commonwealth v. Yandamuri*, 159 A.3d 503, 519-20 (Pa. Super. 2017) (citations omitted).

In determining whether an encounter is investigatory or custodial, a trial court should consider the totality of the circumstances. *Spence*, 290 A.3d at 314.

> An investigative detention may develop into a custodial detention. The key difference between an investigative and a custodial detention is that the latter involves such coercive conditions as to constitute the functional equivalent of an arrest. The court considers the totality of the circumstances to determine if an encounter is investigatory or custodial.
>
> The numerous factors used to determine whether a detention has evolved into an arrest include the cause for the detention, the detention's length, the detention's location, whether the suspect was transported against his or her will, whether physical restraints were used, whether the police used or threatened force, and the character of the investigative methods used to confirm or dispel the suspicions of the police. [Moreover, we note] [c]ustodial interrogation has been defined as questioning initiated by the police after a person has been taken into custody or otherwise deprived of his or her freedom of action in any significant way. Further, an interrogation occurs when the police should know that their words or actions are reasonably likely to elicit an incriminating response from the suspect.

*Id.* at 314–15 (citations & quotations omitted).

> The standard for determining whether police have initiated a custodial interrogation or an arrest is an objective one, with due consideration given to the reasonable impression conveyed to the person interrogated rather than the strictly subjective view of the troopers or the person being seized. An arrest exists when the police intended to take the defendant into custody and the defendant was subjected to the actual control and will of the police. A person is in custody when he is physically denied his freedom of action in any significant way or is placed in a situation in which he reasonably believes that his freedom of action or movement is restricted by the interrogation.

*Yandamuri*, 159 A.3d at 517-18 (citations & quotation marks omitted). In other words, "a person is considered to be in custody for the purposes of

*Miranda* when the officer's show of authority leads the person to believe that [he] was not free to decline the officer's request, or otherwise terminate the encounter." *Commonwealth v. Harper*, 230 A.3d 1231, 1237 (Pa. Super. 2020) (citation omitted).

> If an individual is not advised of his *Miranda* rights prior to custodial interrogation by law enforcement officials, evidence obtained through the interrogation cannot be used against him. [I]n order to trigger the safeguards of *Miranda*, there must be both custody and interrogation. Statements not made in response to custodial interrogation are classified as gratuitous and are not subject to suppression for lack of *Miranda* warnings.

*Commonwealth v. Cruz*, 71 A.3d 998, 1003 (Pa. Super. 2013) (citations omitted).

Here, the trial court found that Appellee was the subject of an improper custodial detention and provided the following reasons for its ruling at the May 26, 2022, videoconference:

> Under the law, the issue before me is whether [Appellee] reasonably felt he was free to leave. I don't think there are many disputes about what the evidence showed, and really I think what is, the primary reason why I'm going to grant the suppression motion . . . [is] whether [Appellee] reasonably believed he was free to leave.
>
> In this case, the police knowingly and intentionally stated mistruths to him. They said that [Officer Scicutella] was going and getting [Appellee's] belongings, he was not. They said that they were going to give him a ride wherever he wanted to go . . . but this is not what was the truth. I think Officer Anglemeyer . . . decided to question him before he, quote, unquote, lawyered up . . . . So they never had the intention of taking him anywhere, the officer was never getting his belongings, they were investigating and they were just trying to keep [Appellee] with him. So that's where I want to draw the line, when there is a knowing misrepresentation stated to [Appellee] to encourage

- 15 -

[him] to stay, I think that's where the line has to be drawn. If they say nothing and he stays, and they're just talking to him and it's not something that is factually not true, I think that's different. So I don't think, even if [Appellee] had the reasonable belief that he was free to go, that it was made on the truthful surroundings of the circumstances at the time.

Additionally, the second problem is that he was never properly **_Mirandized_** from what I saw on the video and the evidence that was presented to me for my consideration. I think only the first two prongs of **_Miranda_** were stated to him, never about his right to a lawyer or right to a free lawyer if he could not afford one.

N.T., 5/26/22, at 3-4 (paragraph breaks added).

We disagree in part with the trial court's initial determination for the following reasons. First, the test for custodial interrogation does not depend on the police officer's subjective intent, but rather, focuses on "the reasonable belief of the individual being interrogated." **_Harper_**, 230 A.3d at 1237 (citation omitted). Therefore, the court's comments emphasizing the officers' intent are misplaced. Moreover, our review of the record does not support a conclusion that the officers' statements amounted to intentional misrepresentations. The body cam footage demonstrates the officers were trying to monitor an ongoing investigation scene, in which they could have taken Appellee to a hotel or another location if their investigation was inconclusive or yielded no results. Furthermore, we note that the officers are permitted to use certain tactics including trickery and other types of non-coercive methods when questioning a suspect. **_See Frazier v. Cupp_**, 394 U.S. 731, 739 (1969) ("The fact that the police misrepresented the statements that [the co-defendant] had made is, while relevant, insufficient in our view

to make this otherwise voluntary confession inadmissible."); *see also* *Commonwealth v. Valdivia*, 195 A.3d 855, 863 (Pa. 2018) (finding defendant's claim, that his consent to search "was not voluntarily given based on purported "stealth, deceit and misrepresentation" by police when they extended the duration of a traffic stop to allow time for a K-9 unit to arrive, to be meritless). Accordingly, we construe the court's finding regarding the officers' "misstatements" during the investigation as erroneous.

Based on the record before us, we conclude Appellee was in "custody" for purposes of *Miranda* from the moment Officer Scicutella frisked him. **See** Scicutella 1 at 00:00. From that point on, one or more officers escorted or prevented Appellee from walking away from them on repeated occasions. **See** *id.* at 00:44-00:50; Moser at 00:00-00:13; Anglemeyer 1 at 00:01-00:18; Anglemeyer 1 at 02:28-02:43; Moser at 11:35-11:45. Moreover, over an hour into their interaction, the officers locked Appellee in a patrol car for roughly six minutes, despite Appellee's subsequent requests to be let out. Moser at 1:07:56-1:13:55. Under these circumstances, a reasonable person would not feel free to leave. **See Yandamuri**, 159 A.3d at 503. As such, we agree with the trial court's conclusion that Appellee was in custody based on the officers' actions because Appellee's freedom of movement was entirely restricted to an area within the officers' immediate supervision, and he was never told that he was free to leave, despite the officers' assurances that they

would help gather his belongings and take him out of the facility. ***See id.*** at 517-18.

However, our inquiry does not end there. As noted above, ***Miranda*** warnings are required only if a suspect is also subject to an interrogation. ***See Harper***, 230 A.3d at 1237 (noting that there must be both custody and interrogation to trigger ***Miranda*** safeguards) (citation omitted). "Interrogation has been held to encompass not only express questioning, but also any words or actions on the part of police officers that they should have known were **reasonably likely to elicit an incriminating statement**." ***Commonwealth v. Hughes***, 639 A.2d 763, 771 (Pa. 1994) (emphasis added).

With respect to Officer Anglemeyer's statements to Appellee, he intended to interrogate Appellee following his conversation with Detective Wagner, but ultimately did not do so. ***See*** Anglemeyer 2 at 03:00-09:30. Instead, Appellee blurted out the fact that he had sex with a "girl" that night before Officer Anglemeyer was able to question him about the allegations. ***See id.*** at 09:15-09:30.[6] An individual's spontaneous utterances or "'blurt out' incriminating statements made in course of small talk with authorities, even in custodial setting, are not *per se* subject to suppression." ***Interest of***

---

[6] In response, Officer Anglemeyer then asked "what led to that," and Appellee described the incident in detail. ***See id.*** at 9:30-12:05.

*N.M.*, 222 A.3d at 770 (citations omitted).  Moreover, "[i]t is well established in Pennsylvania that volunteered or spontaneous utterances are admissible even though the declarant was not *Mirandized*." *Commonwealth v. Baez*, 720 A.2d 711, 720 (Pa. 1998) (quotation marks omitted).  *See also Hughes*, 639 A.2d at 771 (finding that defendant's statement in response to officer's statement was an "unsolicited, gratuitous statement" and, thus, not subject to suppression).

At that point in time, Officer Anglemeyer did not question Appellee about the sexual assault allegations.  Rather, he brought up Appellee's prior comments[7] about another patient at the facility who was not the Victim.  Anglemeyer 2 at 09:15-09:30.  The officer's statement was not a question nor was it an explicit request referencing Appellee's sexual acts with the Victim.  Appellee voluntarily divulged that he had sex with the Victim.  *See id.* at 09:15-09:30.  Moreover, we observe that Officer Anglemeyer's statement was not "reasonably likely to elicit an incriminating response from the suspect," which is a requirement for an interrogation to occur.  *See Hughes*, 639 A.2d 763, 771.  *Compare with Interest of N.M.*, 222 A.3d 759, 774 (Pa. Super. 2019) (finding that specific questions from detectives about burglary were meant to produce an incriminating response and necessitated *Miranda*

---

[7] Appellee's prior comments were in response to a question by Officer Anglemeyer regarding whether Appellee knew why the police may have been called that night.  Anglemeyer 1 at 00:47-00:55.

warnings). As such, we find the trial court erred in suppressing Appellant's unsolicited statement to Officer Anglemeyer about having sex with the Victim.

Rather, we observe Appellee's interrogation began when he was directly confronted with the rape allegations by Detective Wagner. *See* Anglemeyer 4 at 00:12; Moser at 1:15:30-1:28:18. The detective specifically mentioned the Victim had reported that Appellant had raped her and questioned Appellant about the accusations. *Id.* Appellee responded that the sexual encounter had been consensual and recounted the events from that day. Moser at 1:15:30-1:28:18. When Detective Wager asked about the alleged rape, the detective should have given Appellee his *Miranda* warnings, as he should have known his question was likely to elicit an incriminating statement. *See Hughes*, 639 A.2d at 771. His failure to do so renders Appellee's statements to Detective Wagner inadmissible on *Miranda* grounds. *See Miranda*, 384 U.S. 436 at 492 (finding that statements made by suspect without *Miranda* warnings were inadmissible).

As such, we agree with the trial court that Appellee did not receive proper *Miranda* warnings before he was interrogated. *See* N.T., 5/26/22, at 4. Detective Wagner did not provide Appellee with *Miranda* warnings until he was frisked and handcuffed by Detective Wagner more than 30 minutes after the interrogation began. *See* Moser at 1:52:10-1:53:23. Moreover, the detective's misstep did not end there. When Detective Wagner recited the warnings to Appellee, they were incomplete. The detective only advised

Appellee of two out of the four *Miranda* warnings, namely, his right to remain silent and that anything he said could and would be used against him. *See id.* at 1:53:16-1:53:23. Detective Wagner did not inform Appellee of his right to an attorney, nor his right to a free attorney. *See Miranda*, 384 U.S. at 444. Accordingly, the trial court did not err in suppressing Appellee's statements to Detective Wagner because his Fifth Amendment rights as delineated in Miranda were violated.

In summary, we find the trial court properly concluded that Appellee was in a custodial detention at the time of the investigation, albeit on other grounds — because a reasonable person in Appellee's place would not have felt free to leave the officers' supervision. *See N.B.*, 187 A.3d at 945. We disagree with the trial court that Appellee's statement to Officer Anglemeyer should be suppressed because at the time Appellee made the statement, the officer was not expressly questioning him and his comments were not "reasonably likely to elicit an incriminating statement." *Hughes*, 639 A.2d at 771. Nevertheless, we agree with the trial court in suppressing Appellee's statements to Detective Wagner because at that point, the detective subjected Appellee to an interrogation and provided defective *Miranda* warnings.

Accordingly, we affirm in part, reverse in part, and remand for further proceedings. Jurisdiction relinquished.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 9/22/2023